UNITED STATES, Appellant

v

THOMAS G. WEATHERFORD, III, Fireman Apprentice,
U. S. Navy, Appellee

19 USCMA 424, 42 CMR 26

No. 22,629

May 15, 1970

*Lieutenant Thomas J. Donegan, Jr.*, JAGC, USNR, argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel Charles J. Keever*, USMC.

*Captain Frank A. Nelson*, JAGC, USN, and *Lieutenant Martin A. Selzer*, JAGC, USNR, appeared for Appellee, Accused, by direction of the Court.

*Commander E. M. Fulton, Jr.*, JAGC, USN argued *amicus curiae*.

QUINN, Chief Judge:

The question presented by the certificate of the Judge Advocate General of the Navy is whether defense counsel can ever properly argue at trial that a punitive discharge is an appropriate punishment for an accused.

Defense counsel cannot ask the court-martial to impose a punitive discharge when the express ■ or implied desire of the accused is to the contrary. United States v Garcia, 18 USCMA 5, 39 CMR 5 (1968); United States v Mitchell, 16 USCMA 302, 36 CMR 458 (1966). In this case, the United States Navy Court of Military Review noted that defense counsel's argument, material excerpts of which appear in the Appendix to this opinion, conformed to the specific directions of the accused and accorded with the "professional" recommendation of the accused's mother, who was Director of Freshman Studies and Chairman of the Department of Mathematics of Saint Augustine's College and had extensive experience with "student problems."[1] However, the Court of Military Review concluded that, as a matter of law, defense counsel "goes too far when he affirmatively assists . . . [an accused] in developing his plea for a punitive discharge."

An accused has the right to address the sentencing authority in regard to the sentence. As part of that right, he may ask for ■ one kind of punishment to the exclusion of other permissible penalties. The question then is whether he can enlist his counsel's aid to effectuate his plea. Since counsel is bound to represent the interests of his client with all his skill, it is arguable that he must accede to his client's wishes in every case. Certainly, there are instances where accession is in the client's best interest. In United States v Blunk, 17 USCMA 158, 160, 37 CMR 422 (1967), we held that defense counsel "violates no legal or ethical principle in . . . following . . . instructions to present nothing on" the accused's behalf which might influence the court-martial to reject a punitive discharge as an appropriate punishment. Still, defense counsel is not the alter ego of the accused. There are occasions when he, not the accused, must determine his course of conduct, without impairing his obligation to represent the accused. For example, we entertain no doubt that defense counsel can refuse to argue that a death sentence would be better for the accused and society than a period of confinement. The accused can himself declare that he would rather be hanged than imprisoned, but we do not conceive that counsel's devotion to the accused's interests requires him to obey the accused's command that he join in the declaration. A lawyer has no duty to put the hangman's noose around his client's neck.

In numerous cases we have commented on the severity of a punitive discharge. It is not just an opprobrious form of separation from the armed forces, but it has many and long-continued adverse consequences even

---

[1] Among other things, Mrs. Weatherford testified as follows:

". . . [I]n my capacity as his mother, I would not want him to receive a bad conduct discharge. As a professional person, weighing the fact that one must look at the person's ability to cope with social situations after the completion of the service, to meet the expected realities of society and to exercise his own mind in meeting personal needs, and adaptability, and so forth, and knowing that he has an opportunity and has a desire to return to college in September if he were able to do this, I would say . . . that I believe that from a professional point of view, knowing that with this court there are two choices, there is one choice of two, I would have to say that I would recommend a discharge."

in civilian life. See United States v Wheeler, 17 USCMA 274, 276, 38 CMR 72 (1967). In the first instance, therefore, we must assume that no one really wants to effect his separation from the service in that way.

The punitive discharge has been viewed as the "equivalent" of a death sentence. United States v Prow, 13 USCMA 63, 64, 32 CMR 63 (1962). The analogy is appropriate so far as it deals with the individual's relationship to the military community and whether a period of confinement can properly be regarded as a less severe punishment than a punitive discharge. However, a punitive discharge is not the end of life. It may close many doors and foreclose many opportunities, but life continues, and opportunities for individual fulfillment may be presented despite the stigma of the discharge.

It is not hard to imagine an accused convicted of multiple offenses of disrespect to superior officers and willful disobedience of orders to desire a punitive discharge, without other penalties. The limits of punishment for these offenses would strongly indicate the probability of a sentence to both confinement and discharge. Cf. United States v Mitchell, supra, page 304. The accused may acknowledge his failure to carry out his military duties but still desire to meet his personal responsibilities. He may have a wife and a child to support and he may have a promise of employment. He may, therefore, deem it better to plead for discharge without confinement, than to say nothing and face the risk of confinement with a discharge. A plea of this kind under the circumstances is a plea for life, not death. It is a plea for the right to carry out at least part of one's responsibilities, not a plea to end them all. In short, it is a plea for leniency, not harshness. It is to the accused's advantage, therefore, to attempt to persuade the court members that a discharge alone would constitute a fair and appropriate punishment for his crimes. Such a plea is consistent with the concept that the punishment should fit not only the crime, but take into account the peculiar circumstances which merit leniency. See United States v Pierce, 19 USCMA 225, 228, 41 CMR 225 (1970). We conclude, therefore, that, in an appropriate case, defense counsel may properly assist the accused in his attempt to persuade the court-martial to impose no other punishment than a discharge.[2]

Turning to the circumstances of this case, it appears the accused has been unable to accommodate himself to the requirements of the Navy. He entered on active duty on October 30, 1967. On March 18, 1968, he absented himself without authority until May 17, 1968. A month later, he again absented himself without authority and remained away until July 10, 1968. He was tried for these offenses in August 1968, and the approved sentence included confinement at hard labor for three months, partial forfei-

[2] Many accused may be too emotionally involved to reason about the long-range consequences of a punitive discharge. Also, defense counsel and the accused may disagree as to the weight to be attached to competing factors. These, and related problems, indicate that an affirmative plea for a punitive discharge must be approached with extreme care, and with as full an understanding as possible of the present and future situation of the accused. If defense counsel concludes that, in the circumstances of the case and in good conscience, he cannot argue for the kind of sentence the accused desires, he may ask for leave to withdraw as counsel. United States v Blunk, 17 USCMA 158, 37 CMR 422 (1967). A substitution of attorneys at this stage of the proceedings may pose problems, such as the necessity for a continuance or the need for circumspection to avoid the possibility of any inference adverse to the accused, but none of the problems that suggest themselves at this time appear insoluble.

ture of pay, and reduction to grade E-1. On December 2, 1968, he once more absented himself, remaining away until January 18, 1969. This offense was followed by another of the same kind which began on January 29, 1969, and was terminated by apprehension on March 5, 1969. A third absence began on April 28, 1969, and was terminated by apprehension on July 18, 1969. The latter three absences were the subjects of the charges before the court-martial.

Before trial, the accused conferred with defense counsel and was advised of the dire and lasting consequences of a bad-conduct discharge. "Nonetheless," he directed defense counsel "to argue for a Bad Conduct Discharge before . . . [the] court-martial." The accused's mother was consulted, and as indicated earlier, she testified at trial, which was held on August 13–14, 1969, that she believed confinement "would not be warranted," but that a discharge might be appropriate. The President of Saint Augustine's College indicated that the college would accept the accused for the Fall Term, which was to begin on September 11, 1969. It also appeared that the accused faced marital problems that could probably not be dealt with effectively from behind prison bars.

Considering the record, we cannot say that a decision to assist the accused in his plea for a punitive discharge without confinement was a breach of counsel's duty of devotion to the accused. We, therefore, answer in the negative the certified question which asks: "Whether the argument of trial defense counsel on the sentence was prejudicial to the substantial rights of the accused in view of the pretrial direction by the accused to his counsel to argue for a bad conduct discharge."

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Navy for resubmission to the Court of Military Review for further proceedings consistent with this opinion.

Judge DARDEN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I do not believe that there is ever an "appropriate case" where a defense counsel may urge the court to impose a punitive discharge upon his client, even when the argument is designed to persuade the court not to sentence the accused to a period of confinement. As my brothers note, the punitive discharge is not just an opprobrious form of separation from the armed forces. Not only is it the equivalent of a death sentence, insofar as it deals with the serviceman's relationship to the military community (United States v Prow, 13 USCMA 63, 32 CMR 63 (1962)), but it has *many and long-continued* adverse consequences in civilian life as well. United States v Wheeler, 17 USCMA 274, 38 CMR 72 (1967). This Court stated in *Wheeler,* at page 276:

". . . [T]he ordering of a punitive discharge so characterizes an individual that his whole future is utterly destroyed. He is marked far beyond the civilian felon, hampered as he may be by the sneering term 'ex-con,' for, justifiedly or not, the punitive discharge so dishonors and disgraces an accused that he finds employment virtually impossible; is subjected to many legal deprivations; and is regarded with horror by his fellow citizens. Truly, it has come to be the modern equivalent of the ancient practice of branding felons, and the stain it leaves is as ineradicable."

As the late Judge Brosman concluded in his separate opinion in United States v Kelley, 5 USCMA 259, 264, 17 CMR 259 (1954):

". . . Viewed realistically and practically, I doubt that scarcely any punishment is more severe than a punitive discharge."

See also the brief of *amicus curiae* in this case, pages 18 through 21.

The issue of whether defense counsel may properly argue for punitive seperation of his client is not new to this Court. In United States v Richardson, 18 USCMA 52, 53, 39 CMR 52 (1968), we held that the accused was prejudiced as to sentence when defense counsel told the court members that " 'probably the army would be better off without' " the accused and that an " 'appropriate and just sentence' " could include a bad-conduct discharge. And in United States v Garcia, 18 USCMA 75, 76, 39 CMR 75 (1968), we reversed because defense counsel informed the court-martial that the accused's conduct " 'in the last year does warrant a BCD.' " In accord, see United States v Mitchell, 16 USCMA 302, 36 CMR 458 (1966); United States v Cook, 18 USCMA 159, 39 CMR 159 (1969); United States v Mella, 17 USCMA 122, 37 CMR 386 (1967). Defense counsel, in *Mella,* as in this case, had argued that confinement would have a devastating effect on the accused and his family but that " *'A fine, . . . and the severity of a dismissal fit both the crime and the offender in this case.' "* (*Ibid.,* at page 124.) Cf. United States v Cook, supra.

The basic difference between the cited cases and the case at bar is that in the former none of the accused had even indicated a desire for a punitive discharge, while here the accused requested and even demanded that his counsel argue for his punitive separation. This factor, however, is, in my opinion, a difference without a distinction.

Defense counsel has the duty during the presentencing proceedings to present evidence which would tend to cause a court-martial to adjudge a *lesser* sentence. Paragraph 75c(4), Manual for Courts-Martial, United States, 1969 (Revised edition); United States v Allen, 8 USCMA 504, 25 CMR 8 (1957); United States v Blunk, 17 USCMA 158, 37 CMR 422 (1967);

United States v Mitchell and United States v Mella, both supra. This includes argument of counsel for "[u]ntil the sentence proceedings are complete, the trial is not ended." United States v Strand, 6 USCMA 297, 306, 20 CMR 13 (1955); United States v Allen, supra. Since the punitive discharge carries with it so many long-continued adverse consequences, can it logically be argued that it is a lesser sentence than a particular period of conᶜnement?[1] "What punishment may, or may not, be lesser than a dismissal is difficult to ascertain, and particularly is that true when converting that punishment to fines, forfeitures, and other penalties." United States v Sippel, 4 USCMA 50, 58, 15 CMR 50 (1954). Cf. Jones v Ignatius, 18 USCMA 7, 39 CMR 7 (1968).

In United States v Blunk, supra, the accused also wanted a bad-conduct discharge. In writing, he so informed defense counsel and directed him to make no statement on his behalf or to present anything in mitigation. Following the president's advice to the accused as to his right to present matters in mitigation and extenuation, defense counsel responded:

" 'Mr. President, BLUNK is fully aware of his rights in extenuation and mitigation, that is, of course, his right to make a sworn or unsworn statement or have his counsel make an unsworn statement in his behalf, or have witnesses present or any other form of evidence in extenuation. It is his desire to present no such evidence and this, of course, is against the advice of his counsel and he is fully aware of the possible consequences of taking this course of action. I have a document signed by BLUNK and myself which I wish to have attached to the completed record of trial as an Appellate Exhibit, and to be limited to the observation of the reviewing authorities.' " [*Ibid.,* at page 159.]

---

[1] In this case, the court sentenced the accused to a bad-conduct discharge, forfeiture of $82.00 per month for six months, *confinement at hard labor for* six months, and reduction to pay grade E-1, *the maximum imposable under the law.*

Upon inquiry, counsel further informed the court it was not entitled to examine the written statement to which he referred.

We held in *Blunk* that defense counsel had erred in presenting before the court the fact that his client had directed him not to present any evidence in mitigation and extenuation. However, we found no prejudice to the accused under the particular facts of that case.

It is apparent that the situation presented in this case is a far cry from that which we found to be erroneous, although not prejudicially so, in *Blunk*. I am certain that had Blunk's counsel allowed the court members to examine the written document in which Blunk expressed his desire to be punitively discharged, we would have held his action to have prejudiced the substantial rights of that accused. Here, in contrast, defense counsel not only informed the court that Weatherford desired to receive a bad-conduct discharge, but persuasively argued in pertinent part:

". . . It is clear beyond doubt that Thomas WEATHERFORD'S naval service, his usefulness to the Navy, is finished. . . . Consider a bad conduct discharge. A bad conduct discharge is the only tool which this court has to achieve a separation for Thomas WEATHERFORD. It is the fairest, direct way to reconcile the interests of the accused and the Navy. . . . We ask that he be separated from the service by order of this court-martial."

If it were not for the fact that the record indicates otherwise, I would believe that this argument had been made by the prosecution, of which team defense counsel is obviously not a member. Although he is an officer of the court, he owns his "undivided" loyalty to the accused (United States v Lovett, 7 USCMA 704, 707, 23 CMR 168 (1957)), whose interests at trial are nearly always opposed to the interests of the Government. Cf. United States v Green, 5 USCMA 610, 18 CMR

234 (1955). See also United States v Banmiller, 325 F2d 514 (CA3d Cir) (1963); United States v Handy, 203 F 2d 407 (CA3d Cir) (1953). And, while counsel should respect his client's wishes, he is not required to " 'dance to the prisoner's tune' " (United States v Bell, 11 USCMA 306, 308, 29 CMR 122 (1960)), when those wishes are contrary to the ethics of the legal profession and good judgment.

This ethical problem, as it relates to the military judicial process, was thoroughly analyzed by a military writer in the Military Law Review, October 1967, "The Canons, The Code, and Counsel: The Ethics of Advocates Before Courts-Martial" (Department of the Army Pamphlet 27–100–38). Selected excerpts, pertinent to this case, follow:

"The Canons of Ethics and the Trial Code are directly applicable as rules of professional conduct to military advocates practicing before courts-martial under the *Uniform Code of Military Justice*.[40]

* * * * *

". . . He [defense counsel] is not an officer of the court in the same sense that pertains to the law officer. His primary duty is to serve his client. In a litigated case, it means service to his client alone and not in any part to his government on matters relative to that case. In criminal litigation, he can serve no master but his client; however, *his client employs him together with his professional honor. The ethics of his profession are part of his honor*.[246]

* * * * *

"Lastly, there is the problem of the BCD striker—the accused who wants a punitive discharge as his passport out of the service. It is clear that, while trial counsel can argue for a specific sentence and type of punitive discharge, it is improper for defense counsel to acknowledge that a punitive discharge is appropriate when the accused has asked to be retained in service.[399] But what are the de-

**429**

fense counsel's ethical obligations when the accused does not wish to be retained and even takes the witness stand to express his desires? A Navy board of review[400] has indicated that the defense counsel must not assist the accused in this endeavor by posing appropriate questions to the accused while he is on the stand or subsequently arguing for the imposition of such a discharge. Defense counsel bears the responsibility to attempt to dissuade his client from this course of action and, even if the client persists, counsel may not aid him. The special ethical code which governs the advocate who acts for another has long discredited the 'alter ego' theory which would ascribe no individual responsibility to counsel for the actions he takes under the guise that he is only doing his client's bidding.

.　.　.　.　.

"[40] See B. FELD, A MANUAL OF COURTS-MARTIAL PRACTICE AND APPEAL 162 (1957), as to the applicability of the canons.

.　.　.　.

"[246] See Stayton, *Cum Honore Officium,* 19 TEXAS B. J. 765 (1956); Curtis, *The Ethics of Advocacy,* 4 Stan. L. Rev 3 (1951).

.　.　.　.

"[399] United States v Mitchell, 16 USCMA 302, 36 CMR 458 (1966).

"[400] NCM S–65–1378, Hoffman, 4 October 1965." [Emphasis partially supplied.] [*Ibid.,* at pages 9, 57, 93, and 94.]

In my opinion, if defense counsel is unable to dissuade his client from demanding a punitive separation, he should merely have the accused take the stand and make whatever statement he desires. More than that his lawyer should not and cannot ethically do.

I believe that the Court of Military Review, in this case, was correct in holding that defense counsel "goes too far when he argues to the court for a punitive discharge as the only appropriate punishment."

**430**

I would answer the certified question in the affirmative and affirm the decision of the Court of Military Review.

### APPENDIX

#### Excerpt from Defense Counsel's Argument

"DC: Your Honor, Mr. President, defense has an argument. This court is charged with the responsibility of forging a sentence for Thomas WEATHERFORD. This sentence should be based on a hardheaded, realistic appraisal of the interests of the Navy and the accused. It should be the product of reason, not passion; it should be based on educated judgment, not vindictiveness. Consider the evidence before you, the evidence in defense's case in extenuation and mitigation, what conclusions should be drawn. First, Thomas WEATHERFORD is an imaginative person whose promise and ability are tragically marred. He has had difficulties which threaten the promise of his ability and his plans. His wife and child, in one way or another, have been partial causes of his unauthorized absence. A fear of authority and his personal difficulties have done the rest. Fourth, any chance of reconciling the problems of the accused with the interests of the Navy must be met at this court-martial. Now, fifth, Thomas WEATHERFORD'S mother, in her professional judgment, has recommended discharge from the service, although that is not the recommendation she would make in her capacity as a mother. Sixth, Thomas WEATHERFORD'S mother, again in her professional judgment, has recommended no prison term. Consider the positive side of Thomas WEATHERFORD, if you will. He is extremely bright. He plans to complete college and follow a career in industry. He is sensitive. . . . He has attempted to solve his personal problems through obtaining a divorce from his wife. The dark and light sides of his personality, combined with tragedy, have produced the record of unauthorized absence before you. What

are the interests of the Navy? First, it is clear that confinement is no remedy. His mother, in her professional judgment, recommended against it. There are several reasons why confinement is an authorized punishment. None of the reasons apply to Thomas WEATHERFORD. Prosecution argues that confinement will act to deter others. It is further the argument that confinement would rehabilitate Thomas WEATHERFORD. It is clear beyond doubt that Thomas WEATHERFORD'S naval service, his usefulness to the Navy, is finished. Confinement will not make him a better sailor. Confinement for him will not deter others. Deterrence depends on publicity, and publicity of this court-martial will be negligible, so the verdict of this court-martial will not act to deter other people. There is only one reason why a court-martial might want to award confinement. That reason is vindictiveness, retribution, punishment for its own sake, not punishment based on reason, educated judgment. Passion, retribution, are poor reasons for spending the government's money. The government will get no benefits from confining Thomas WEATHERFORD. All that it will get for the astronomical costs of confining and supporting Thomas WEATHERFORD is the menial labor that he would perform during confinement. For menial labor the government will have to house, clothe and feed Thomas WEATHERFORD. It will have to pay his bills, pay medical bills, in the event, anyway, he would have to go to sick call. For all of this, all this investment, it gets only menial labor. Consider a bad conduct discharge. A bad conduct discharge is the only tool which this court has to achieve a separation for Thomas WEATHERFORD. It is the fairest, direct way to reconcile the interests of the accused and the Navy. The harm that a bad conduct discharge will do Thomas WEATHERFORD'S career is more than sufficient punishment for him. . . . We ask you then that you sentence, that the sentence you construct be based on reason, not retribution; on evidence, not anger. We ask that Thomas WEATHERFORD be reduced to pay grade E-1. We ask that whatever forfeitures you may consider appropriate be imposed. We ask that he be confined for no more than a month, additional to the long time he has already served while awaiting discharge. This for the purpose of allowing procedures to go through. We ask that he be separated from the service by order of this court-martial."