UNITED STATES, Appellee

v.

Joshua L. BOLKAN, Airman First Class
U. S. Air Force, Appellant

No. 00-0673

Crim. App. No. 33508

United States Court of Appeals for the Armed Forces

Argued March 29, 2001

Decided September 20, 2001

CRAWFORD, C.J., delivered the judgment of the Court, in which GIERKE, J., joined. BAKER, J., filed an opinion concurring in the result. SULLIVAN and EFFRON, JJ., each filed a dissenting opinion.

## Counsel

For Appellant: Captain Patrick J. Dolan (argued); Colonel James R. Wise and Lieutenant Colonel Timothy W. Murphy (on brief).

For Appellee: Major Martin J. Hindel (argued); Colonel Anthony P. Dattilo, Major Lance B. Sigmon, and Major Bryan T. Wheeler (on brief).

Military Judge: William M. Burd

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

United States v. Bolkan, No. 00-0673/AF

Chief Judge CRAWFORD delivered the judgment of the Court.

Contrary to his pleas, appellant was convicted by officer members of the robbery of JS, in violation of Article 122, Uniform Code of Military Justice (UCMJ), 10 USC § 922. The convening authority approved the sentence of a bad-conduct discharge. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. We granted review of the following issue:

> WHETHER APPELLANT'S SENTENCE MUST BE SET ASIDE
> BECAUSE THERE IS SOME EVIDENCE IN THE RECORD
> WHICH FAIRLY INDICATES THAT APPELLANT DESIRED
> TO BE RETAINED IN THE AIR FORCE DESPITE HIS
> CONVICTION AND DEFENSE COUNSEL IMPLIED THAT A
> PUNITIVE DISCHARGE WAS AN APPROPRIATE PUNISHMENT.

We hold that if there was error, it was harmless.

FACTS

Caught in a sex scheme in which appellant was taped by JS performing sexual acts, he and his friend returned to the house to recover the videotapes by force. Appellant and his friend, Airman Miller, were students at the Defense Language Institute at the Presidio of Monterey, California. In January 1998, they went to San Francisco to attend a "rave" party. At the party, the victim, the "owner-producer" of Thrasher Productions, a purported adult film enterprise, approached them. When the victim gave them his business card, they expressed their concerns because they were active duty Air Force servicemembers.

2

Since the party would not begin for a few hours, they went with the victim to his apartment, where they completed a questionnaire, including more than 70 questions about their sexual preferences.

After completing the questionnaire, both indicated they were interested in "this kind of work." They then left the victim's house to go to the party. However, at 4:00 a.m., they called the victim and asked about spending the night. He agreed, and they returned to his apartment. The next morning, the two left but were invited back for an interview and screen test. The interview again consisted of several questions concerning their sexual preferences, and whether they could perform certain sexual acts while being filmed. They agreed but asked about compensation. He said there was none. Before leaving, they told the victim they would rethink the offer. The next week, they called back and agreed to the videotape interview and filming.

After completing the second interview concerning more sexual preference questions, appellant masturbated before the camera. The victim then masturbated appellant and orally copulated him. After the interview and screen test, appellant told the victim that he was comfortable and was "interested ... in this type of business."

3

Sometime the next week, Airman Miller called the victim to go through the interview and filming process.  In early February, he and appellant returned to the victim's apartment.  Airman Miller asked to view appellant's interview tape.  However, after viewing the tape for several minutes, Airman Miller grabbed the victim's throat, held him in a choke hold, and put a serrated eight-inch knife to his neck.  Airman Miller told the victim they had a "change of heart."  They told the victim not to yell or they would "knock [his] lights out."  Additionally, they tried to tape his legs but he resisted.  Airman Miller told the victim that if he did not cooperate, some Navy seals would return and finish where they left off.  Appellant seconded Airman Miller's statement.  While Airman Miller held the victim at knifepoint, appellant retrieved the videotape and interview logs.  Before they left, they warned the victim not to disclose their actions to anybody.

Appellant's testimony varied from the victim's.  He admitted that they went to the victim's house to retrieve the tapes and interview logs, but stated that when the knife was pulled out by Airman Miller, they were laughing about it.  When they left with the tapes, they called the victim a "silly faggot."  However, appellant admitted he and Airman Miller were interested in the adult film business and would be happy to be filmed for 50 dollars for performing various sexual acts.  The

4

court members rejected the contention that the knife was not used for the robbery and that there was an amicable return of the tapes to Airman Miller and appellant, possibly because appellant and Airman Miller could have called and had an amicable return of the tapes, but they did not.

On sentencing, the prosecutor argued that the members should look at the planning which preceded the robbery, the impact on the victim, and the fact that appellant lied to them. He emphasized that even after carrying out their plan to a tee, appellant and Airman Miller took the remainder of the day to sightsee in San Francisco, "completely unaffected by what they had done." Looking at these factors, the prosecutor recognized the maximum punishment was a dishonorable discharge, 10 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. Even so, he recommended a bad-conduct discharge, 12 months' confinement, total forfeitures, and reduction to the lowest enlisted grade.

Appellant, on the other hand, made an unsworn statement that he wished to remain in the Air Force. In addition, and in contrast to the prosecutor's argument, defense counsel made a lengthy argument. During the argument, defense counsel strenuously argued against confinement and a punitive discharge. She said:

But do not give him a punitive discharge. If his conduct is such that you want to brand him for the rest of his life with a punitive discharge, the judge will instruct you that a punitive discharge leaves an inirradicable [sic] stigma on a person such as Airman Bolkan.

The crime of which he's been convicted of, society may one day forgive him and may one day forget it. He's eighteen. He's young. He's naive. But if you give him a punitive discharge, that's going to follow him around for the rest of his life. When he's nineteen, twenty-nine, fifty-nine, seventy-nine. That is not something society is ever going to forgive or forget.

Countering the assistant trial counsel's argument, appellant's defense counsel made the following recommendation:

The defense would submit that you should give him hard labor without confinement, reduce him to E-1 and restrict him to base. And give him the reprimand. This will stay in his file permanently and every commander that he has will see that in his file.

It was only then that appellant's counsel made her statement regarding a possible choice between confinement and a punitive discharge. Closing, she said:

If you must choose between confinement and a bad-conduct discharge, give him the punitive discharge. He might not ever recover from it and it will follow him around the rest of his life, but he will be given a chance to go out in society and use his skills and his intelligence.

The Court of Criminal Appeals noted that "there is evidence of both appellant's express desire to remain on active duty and his desire not to be confined." Unpub. op. at 5. The Court concluded that "[t]aking the argument as a whole," defense

6

counsel did not ask for a discharge in lieu of confinement. "His request for discharge in lieu of confinement merely asked for the one that would be easier for his client to endure. Under these circumstances, we find no error occurred." Id.

The defense asserts that trial defense counsel inappropriately conceded a punitive discharge as being appropriate, and that when the judge heard such a concession, he should have made an inquiry. Contrariwise, the Government argues that defense counsel made a vigorous and lengthy argument to keep appellant in the service, and the two sentences quoted above are, in effect, taken out of context. According to the Government, the argument in this case did not constitute a concession of a punitive discharge, but rather, "[i]n light of the prosecution's vigorous call for such a heavy sentence, trial defense counsel argued for the lowest possible sentence which had some reasonable probability of acceptance." Answer to Final Brief at 8.

## DISCUSSION

Military accuseds have a constitutional and codal right to the effective assistance of counsel at trial. U.S. Const. Amend. VI; Art. 27, UCMJ, 10 USC § 827; see United States v. MacCulloch, 40 MJ 236 (CMA 1994). The right to counsel is probably the paramount right in ensuring that the adversarial system functions properly. The Air Force, and all the armed

7

United States v. Bolkan, No. 00-0673/AF

forces, ensure counsels' independence with trial defense organizations totally separate from the command and staff judge advocates' offices.  Cf.  United States v. Norfleet, 53 MJ 266 (2000).

Defense counsel are ethically charged with diligently representing their accused at trial.  Air Force Rule of Professional Conduct 1.3 (4 February 1998).  This requires a wide range of professional decisions, including what evidence to introduce and what arguments to make.  Air Force Standard for Criminal Justice 4-5.2(b) (8 November 1999).  However, the accused has control of the plea, pretrial agreement, questions as to forum, right to testify, and whether to appeal.  Id.; see United States v. Teague, 953 F.2d 1525 (11th Cir. 1992).

We have faced the granted issue numerous times in the past. See, e.g., United States v. Pineda, 54 MJ 298 (2001); United States v. Lee, 52 MJ 51 (1999); United States v. Dresen, 40 MJ 462 (CMA 1994); United States v. Lyons, 36 MJ 425 (CMA 1993); United States v. Robinson, 25 MJ 43 (CMA 1987); United States v. Holcomb, 20 USCMA 309, 43 CMR 149 (1971); United States v. Weatherford, 19 USCMA 424, 42 CMR 26 (1970); United States v. Mitchell, 16 USCMA 302, 36 CMR 458 (1966).  These cases clearly instruct that when an accused asks the sentencing authority to be allowed to remain on active duty, defense counsel errs by conceding the propriety of a punitive discharge.  This is

because "[d]efense counsel is an advocate for the accused, not an amicus to the court." United States v. Volmar, 15 MJ 339, 340 (CMA 1983), citing Ellis v. United States, 356 U.S. 674 (1958). However, when advocacy falls short of that required to render effective assistance of counsel, we have tested for prejudice. See Strickland v. Washington, 466 U.S. 668, 691 (1984).

Appellant has not directly attacked the adequacy of his representation, "no[r] asserted ... that his defense counsel failed to discuss" trial tactics for sentencing with him. See Lee, supra at 52. However, we will assume that there was a concession, and that the judge erred in not making an inquiry into whether defense counsel's "better to discharge than confine" argument reflected appellant's desire. We hold that any error was harmless.

In every case, we ask counsel to determine the odds of what might happen as to the findings or sentence and to structure their arguments based on these probabilities. United States v. Fluellen, 40 MJ 96, 98 (CMA 1994). Appellant's counsel made a strategic decision at the end of her argument and recognized that if the members "must choose between confinement and a bad-conduct discharge, [they should] give him the punitive discharge." Appellant faced a heavy maximum punishment, including a dishonorable discharge, 10 years' confinement,

9

reduction to the lowest enlisted grade, and total forfeitures.
Para. 47e(2), Part IV, Manual for Courts-Martial, United States
(1998 ed.).

Additionally, the assistant trial counsel recommended a
sentence to include a bad-conduct discharge, 12 months'
confinement, total forfeitures, and reduction to the lowest
enlisted grade.  In light of the prosecution's argument, trial
defense counsel was realistic in her approach by "accept[ing]
... the force of adverse facts."  Mitchell, supra at 304, 36 CMR
at 460.

This case is similar to Volmar, where we recognized that
there may be occasions where "there is really no alternative of
retention in the service."  15 MJ at 343.  In such
circumstances, a tactical concession by trial defense counsel,
in support of a client's rational choice (avoiding confinement),
often communicated in the privacy of defense counsel's office
before trial commences, is good courtroom advocacy.  Here,
appellant portrayed himself as a homosexual for commercial
purposes and then, realizing the filming was based on the
victim's sexual predilections, robbed the victim to obtain the
video tape.  Defense counsel knew that the members would very
likely ask themselves, is this the type of individual we want to
remain in the service?  She would also know that the
probabilities were very high that the answer would be "no."

United States v. Bolkan, No. 00-0673/AF

Thus, we conclude that any error based on this apparent concession and the failure of the judge to make an appropriate inquiry was harmless.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

United States v. Bolkan, No. 00-0673/AF

BAKER, Judge (concurring in the result):

During sentencing, the assistant defense counsel (ADC) argued against both confinement and a discharge. "Confinement, in this case, is not appropriate," the ADC argued. "The prosecution hasn't provided you with any reasonable justification for confinement and that's because there isn't any." The ADC also argued against a discharge, making it clear that the views expressed reflected appellant's explicit desire to remain in the Air Force. She said:

> The Air Force can keep him working. They trained him as a linguist and they can keep him on the job and have him be a productive member of the Air Force. . . . He enjoys being a linguist; its challenging for him and he would like for you to give him the opportunity to get back to work . . . . You can reduce him to E-1. Take the rank . . . take away some of his pay. But do not give him a punitive discharge . . . . He's eighteen. He's young. He's naïve. But if you give him a punitive discharge, that's going to follow him around for the rest of his life.

The defense also called appellant's uncle. The uncle testified that confinement "would be the worst thing for him." When the ADC asked the uncle about a punitive discharge, the military judge sustained trial counsel's objection to the question. Having argued against both confinement and a discharge, the ADC nonetheless closed her statement, saying: "If you must choose between confinement and a bad-conduct discharge, give him the punitive discharge." Defense counsel offered nothing to suggest this reflected appellant's position

or priorities.  Although a close call, in this factual context, the ADC's statement amounted to a concession where the appellant was squarely exposed to both a punitive discharge and 10 years' confinement for a violent crime.  The ADC let the members off her sentencing argument hook.  Accepting that they might disregard her argument, she steered members to a punitive discharge by arguing a preference against confinement.

It is error for defense counsel to concede the appropriateness of a bad-conduct discharge in sentencing argument without an adequate record that appellant agreed with this argument.  United States v. Pineda, 54 MJ 298, 299, 301 (2001).  In United States v. Volmar, 15 MJ 339 (CMA 1983), this Court recognized that there may be good tactical reasons representing the best advocacy on behalf of the accused to concede a bad-conduct discharge, where "there really was no alternative of retention in the service."  Id. at 343.  However, the present case is distinguishable from Volmar because there is "some evidence in the record which fairly indicates that the accused desire[d] to be retained in the service despite his conviction."  Id. at 341.

Here, the evidence is clear and unequivocal.  Appellant's counsel stated:  "He enjoys being a linguist. . . and he would like for you to give him the opportunity to get back to work. . . . [D]o not give him a punitive discharge."  Thus, in the

2

absence of "an adequate record of appellant's desire that a punitive discharge be actually imposed," it is error for defense counsel to concede a punitive discharge, regardless of tactical motive. Pineda, 54 MJ at 301. As important, in this context, the military judge erred by not inquiring into the apparent contradiction between a sentencing statement that presents the client's desire to avoid confinement and discharge, and yet invites the members to choose one over the other in closing. See United States v. Lyons, 36 MJ 425, 427 (CMA 1993).

A realistic assessment of possible outcomes is good lawyering. However, a fundamental representational choice, such as a decision whether to seek to stay in the service or passively accept a punitive discharge, is for the client to make. As a result, case law dictates that judges test an apparent ambiguity between counsel's argument and the accused's desires. Military judges should do so for appearance reasons as well. Defense counsel may be perceived by some members of the public as wearing the same uniform as the prosecution--no matter how zealously and effectively they pursue their distinct and independent mission.

Nonetheless, "[a] finding or sentence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the

3

accused." Art. 59(a), UCMJ, 10 USC § 859(a). Case law further informs the statutory test for harmless error:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

United States v. Pollard, 38 MJ 41, 52 (CMA 1993), quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946).

In Pineda, this Court put a further gloss on the test for harmless error when assessing counsel concession on discharge: "[W]e assessed the impact of that error on the approved sentence to determine whether sufficient prejudice existed for a finding of ineffective assistance of counsel under the second prong of the test in Strickland v. Washington[.]" 54 MJ at 301. Thus, "where the facts of a given case compel a conclusion that a bad-conduct discharge was reasonably likely, we do not normally order a new sentence hearing." Id.

Appellant faced a maximum punishment including a dishonorable discharge, 10 years' confinement, reduction to the lowest enlisted grade, and total forfeitures. Para. 47e(2), Part IV, Manual for Courts-Martial, United States (1998 ed.). The Government recommended a sentence of a bad-conduct

discharge, 12 months confinement, reduction to the lowest enlisted grade, and total forfeitures. As is apparent, the Government's recommendation was substantially below the maximum confinement exposure. The panel awarded appellant no confinement. This suggests that both the panel and the Government weighed factors in mitigation when considering appellant's sentence. However, it does not necessarily follow that judgments about confinement parallel judgments about punitive separation. A bad-conduct discharge addresses a distinct facet of punishment, namely whether an accused should be separated from the service under conditions of dishonor, whether or not he or she is confined.

In this case, the record reflects a premeditated crime of robbery, involving the violent employment of a knife in a manner that might well have resulted in death or serious injury. Appellant's record of service includes two letters of reprimand. Appellant may have been duped, and he may be naïve, but there is no question that he placed himself in a position of trouble on three separate occasions, including one occasion involving pornographic filming.

Nor does the disposition of Airman Miller's case change this analysis. Appellant, and not Miller, was the central protagonist in this crime. It was appellant, not Miller, who engaged in pornographic filming. Miller's record of service is

5

not at issue and not part of the record.  Therefore, the disposition of Miller's case cannot meaningfully serve as a point of reference for appellant's case in the absence of a claim alleging a violation of the rule in United States v. Lacy, 50 MJ 286 (1999).

Based on these facts, a bad-conduct discharge was reasonably likely.  Moreover, a reasonable person would not be left in doubt, let alone grave doubt, that counsel's closing statement would have substantially swayed appellant's panel into awarding a bad-conduct discharge.

United States v. Bolkan, 00-0673/AF

SULLIVAN, Judge (dissenting):

I agree with Judge Effron and Judge Baker that error occurred in this case when the military judge failed to inquire whether appellant approved defense counsel's argument for a punitive discharge. Accordingly, I dissent from the lead opinion's suggestion that United States v. Pineda, 54 MJ 298 (2001), may not have been violated in this case.

Turning to the question of harmlessness, again I must disagree with the lead opinion. United States v. Volmar, 15 MJ 339 (CMA 1983), technically is a no-error case, not a harmless-error case. I also disagree with Judge Baker's separate opinion on harmless error, in particular his assertion that the results of Airman Miller's case are not relevant on this question.

The inquiry for prejudice under United States v. Pineda, supra at 301, is whether the facts of a given case compel a conclusion that a bad-conduct discharge was reasonably likely. Unlike Pineda, this was a trial before members, and appellant did not implicitly concede that a punitive discharge was reasonably certain. Moreover, his youth, the brevity of his military career, and the bizarre circumstances of his case suggest that a

United States v. Bolkan, No. 00-0673/AF

forceful plea for clemency might have been successful.  See

United States v. Dresen, 40 MJ 462, 465 (CMA 1994).


    Finally, as indicated in the lead opinion, appellant's

co-accused was the principal actor in the armed robbery, i.e, the

man who held the knife to the throat of the victim.  The

undisputed fact that he did not receive a punitive discharge for

the same or similar offenses as appellant seriously undermines a

conclusion that a punitive discharge was reasonably likely in

appellant's case.  Id.  (See appellant's clemency submission

dated November 23, 1998.)

United States v. Bolkan, No. 00-0673/AF


EFFRON, Judge (dissenting):


If the issue in this case asked whether the Court of Criminal Appeals could approve appellant's sentence under the sentence appropriateness standards of Article 66, UCMJ, 10 USC § 866, I would affirm. The issue, however, is whether defense counsel's improper sentencing argument constituted prejudicial error under Article 59(a), UCMJ, 10 USC § 859(a). I respectfully disagree with the lead opinion's conclusion that any error in the defense counsel's closing argument was harmless.

The lead opinion asserts that "[i]n every case, we ask counsel to determine the odds of what might happen as to the findings or sentence and to structure their arguments based on these probabilities," __ MJ at (9), citing United States v. Fluellen, 40 MJ 96, 98 (CMA 1994). Our case law does not obligate defense counsel to make such a calculation. We have held, however, that the decision to concede the appropriateness of a discharge is a matter reserved to the accused, not defense counsel. If counsel concedes the appropriateness of a punitive discharge, "even as a tactical step to accomplish mitigation of other elements of a possible sentence -- counsel must make a record that such advocacy is pursuant to the accused's wishes."

United States v. Bolkan, No. 00-0673/AF

United States v. Pineda, 54 MJ 298, 301 (2001) (emphasis omitted).

In this case, there is a clear record that appellant desired to remain in service, as reflected in counsel's request for the military judge to instruct the member's on that point, as well as the testimony from appellant's uncle. The record does not demonstrate, however, that appellant consented to counsel's argument -- that if the members "must choose between confinement and a bad-conduct discharge, give him the punitive discharge." The court below asserted that counsel's comments "were merely a realistic recognition that either confinement or discharge, perhaps both, were likely punishments for his client's offense ... [and that the] request for discharge in lieu of confinement merely asked for the one that would be easier for his client to endure." Unpub. op. at 5. The conclusion that the denial of benefits and permanent stain of a punitive discharge would be "easier to endure" than confinement represents the views of the court below, not appellant.

The record does not indicate appellant informed his counsel that he would more easily endure a punitive discharge. The record contains nothing from trial defense counsel that would support the lead opinion's speculation that appellant made any such communication "in the privacy of defense counsel's office" prior to trial. ___ MJ at (10).

2

The lead opinion concludes that any error was harmless, relying upon the nature of the offense and the fact that appellant faced a maximum of a dishonorable discharge and 10 years' confinement. As the opinion acknowledges, however, the prosecution only recommended 12 months' confinement, and the sentence imposed by the members did not include any confinement.

The members' decision to adjudge no confinement may well reflect a number of favorable sentencing factors, including appellant's young age – 18 years at the time of the offense – the victim's unsavory business, the victim's prior conviction for child pornography, and the fact that the knife was held by appellant's co-actor, Airman Miller. It is also noteworthy that Airman Miller's sentence did not include a discharge, and included only a brief 45-day period of confinement and partial forfeitures.

The issue in this case is not whether appellant's sentence was appropriate, but whether there was a reasonable possibility that appellant might have received a different sentence, such as the relatively brief period of confinement without a discharge adjudged in Airman Miller's case. Given the nature of the sentencing information, the absence of confinement imposed upon appellant, and the relatively light sentence imposed on his co-actor, we cannot say with fair assurance that appellant would have received a punitive discharge had his counsel not urged the

3

members to choose a discharge over confinement.  The military judge erred by failing to ensure that the counsel's argument represented appellant's wishes, and the error was prejudicial.