Chief Judge CRAWFORD
delivered the judgment of the Court.
Contrary to his pleas, appellant was convicted by officer members of the robbery of JS, in violation of Article 122, Uniform Code of Military Justice (UCMJ), 10 USC § 922. The convening authority approved the sentence of a bad-conduct discharge. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. We granted review of the following issue:
WHETHER APPELLANT’S SENTENCE MUST BE SET ASIDE BECAUSE THERE IS SOME EVIDENCE IN THE RECORD WHICH FAIRLY IN *426 DICATES THAT APPELLANT DESIRED TO BE RETAINED IN THE AIR FORCE DESPITE HIS CONVICTION AND DEFENSE COUNSEL IMPLIED THAT A PUNITIVE DISCHARGE WAS AN APPROPRIATE PUNISHMENT.
We hold that if there was error, it was harmless.
FACTS
Caught in a sex scheme in which appellant was taped by JS performing sexual acts, he and his friend returned to the house to recover the videotapes by force. Appellant and his friend, Airman Miller, were students at the Defense Language Institute at the Presi-dio of Monterey, California. In January 1998, they went to San Francisco to attend a “rave” party. At the party, the victim, the “owner-producer” of Thrasher Productions, a purported adult film enterprise, approached them. When the victim gave them his business card, they expressed their concerns because they were active duty Air Force ser-vicemembers. Since the party would not begin for a few hours, they went with the victim to his apartment, where they completed a questionnaire, including more than 70 questions about their sexual preferences.
After completing the questionnaire, both indicated they were interested in “this kind of work.” They then left the victim’s house to go to the party. However, at 4:00 a.m., they called the victim and asked about spending the night. He agreed, and they returned to his apartment. The next morning, the two left but were invited back for an interview and screen test. The interview again consisted of several questions concerning their sexual preferences, and whether they could perform certain sexual acts while being filmed. They agreed but asked about compensation. He said there was none. Before leaving, they told the victim they would rethink the offer. The next week, they called back and agreed to the videotape interview and filming.
After completing the second interview concerning more sexual preference questions, appellant masturbated before the camera. The victim then masturbated appellant and orally copulated him. After the interview and screen test, appellant told the victim that he was comfortable and was “interested ... in this type of business.”
Sometime the next week, Airman Miller called the victim to go through the interview and filming process. In early February, he and appellant returned to the victim’s apartment. Airman Miller asked to view appellant’s interview tape. However, after viewing the tape for several minutes, Airman Miller grabbed the victim’s throat, held him in a choke hold, and put a serrated eight-inch knife to his neck. Airman Miller told the victim they had a “change of heart.” They told the victim not to yell or they would “knock [his] lights out.” Additionally, they tried to tape his legs but he resisted. Airman Miller told the victim that if he did not cooperate, some Navy seals would return and finish where they left off. Appellant seconded Airman Miller’s statement. While Airman Miller held the victim at knifepoint, appellant retrieved the videotape and interview logs. Before they left, they warned the victim not to disclose them actions to anybody.
Appellant’s testimony varied from the victim’s. He admitted that they went to the victim’s house to retrieve the tapes and interview logs, but stated that when the knife was pulled out by Airman Miller, they were laughing about it. When they left with the tapes, they called the victim a “silly faggot.” However, appellant admitted he and Airman Miller were interested in the adult film business and would be happy to be filmed for 50 dollars for performing various sexual acts. The court members rejected the contention that the knife was not used for the robbery and that there was an amicable return of the tapes to Airman Miller and appellant, possibly because appellant and Airman Miller could have called and had an amicable return of the tapes, but they did not.
On sentencing, the prosecutor argued that the members should look at the planning which preceded the robbery, the impact on the victim, and the fact that appellant lied to them. He emphasized that even after carry *427 ing out their plan to a tee, appellant and Airman Miller took the remainder of the day to sightsee in San Francisco, “completely unaffected by what they had done.” Looking at these factors, the prosecutor recognized the maximum punishment was a dishonorable discharge, 10 years’ confinement, total forfeitures, and reduction to the lowest enlisted grade. Even so, he recommended a bad-conduct discharge, 12 months’ confinement, total forfeitures, and reduction to the lowest enlisted grade.
Appellant, on the other hand, made an unsworn statement that he wished to remain in the Air Force. In addition, and in contrast to the prosecutor’s argument, defense counsel made a lengthy argument. During the argument, defense counsel strenuously argued against confinement and a punitive discharge. She said:
But do not give him a punitive discharge. If his conduct is such that you want to brand him for the rest of his life with a punitive discharge, the judge will instruct you that a punitive discharge leaves an inirradicable [sic] stigma on a person such as Airman Bolkan.
The crime of which he’s been convicted of, society may one day forgive him and may one day forget it. He’s eighteen. He’s young. He’s naive. But if you give him a punitive discharge, that’s going to follow him around for the rest of his life. When he’s nineteen, twenty-nine, fifty-nine, seventy-nine. That is not something society is ever going to forgive or forget.
Countering the assistant trial counsel’s argument, appellant’s defense counsel made the following recommendation:
The defense would submit that you should give him hard labor without confinement, reduce him to E-l and restrict him to base. And give him the reprimand. This will stay in his file permanently and every commander that he has will see that in his file.
It was only then that appellant’s counsel made her statement regarding a possible choice between confinement and a punitive discharge. Closing, she said:
If you must choose between confinement and a bad-conduct discharge, give him the punitive discharge. He might not ever recover from it and it will follow him around the rest of his life, but he will be given a chance to go out in society and use his skills and his intelligence.
The Court of Criminal Appeals, 2000 WL 875349, noted that “there is evidence of both appellant’s express desire to remain on active duty and his desire not to be confined.” Unpub. op. at 5. The Court concluded that “[t]aking the argument as a whole,” defense counsel did not ask for a discharge in lieu of confinement. “His request for discharge in lieu of confinement merely asked for the one that would be easier for his client to endure. Under these circumstances, we find no error occurred.” Id.
The defense asserts that trial defense counsel inappropriately conceded a punitive discharge as being appropriate, and that when the judge heard such a concession, he should have made an inquiry. Contrariwise, the Government argues that defense counsel made a vigorous and lengthy argument to keep appellant in the service, and the two sentences quoted above are, in effect, taken out of context. According to the Government, the argument in this case .did not constitute a concession of a punitive discharge, but rather, “[i]n light of the prosecution’s vigorous call for such a heavy sentence, trial defense counsel argued for the lowest possible sentence which had some reasonable probability of acceptance.” Answer to Final Brief at 8.
DISCUSSION
Military accuseds have a constitutional and codal right to the effective assistance of counsel at trial. U.S. Const. Amend. VI; Art. 27, UCMJ, 10 USC § 827; see United States v. MacCulloch, 40 MJ 236 (CMA 1994). The right to counsel is probably the paramount right in ensuring that the adversarial system functions properly. The Air Force, and all the armed forces, ensure counsels’ independence with trial defense organizations totally separate from the command *428 and staff judge advocates’ offices. Cf. United States v. Norfleet, 53 MJ 262 (2000).
Defense counsel are ethically charged with diligently representing their accused at trial. Air Force Rule of Professional Conduct 1.3 (4 February 1998). This requires a wide range of professional decisions, including what evidence to introduce and what arguments to make. Air Force Standard for Criminal Justice 4-5.2(b) (8 November 1999). However, the accused has control of the plea, pretrial agreement, questions as to forum, right to testify, and whether to appeal. Id.; see United States v. Teague, 953 F.2d 1525 (11th Cir.1992).
We have faced the granted issue numerous times in the past. See, e.g., United States v. Pineda, 54 MJ 298 (2001); United States v. Lee, 52 MJ 51 (1999); United States v. Dresen, 40 MJ 462 (CMA 1994); United States v. Lyons, 36 MJ 425 (CMA 1993); United States v. Robinson, 25 MJ 43 (CMA 1987); United States v. Holcomb, 20 USCMA 309, 43 CMR 149 (1971); United States v. Weatherford, 19 USCMA 424, 42 CMR 26 (1970); United States v. Mitchell, 16 USC-MA 302, 36 CMR 458 (1966). These cases clearly instruct that when an accused asks the sentencing authority to be allowed to remain on active duty, defense counsel errs by conceding the propriety of a punitive discharge. This is because “[d]efense counsel is an advocate for the accused, not an amicus to the court.” United States v. Volmar, 15 MJ 339, 340 (CMA 1983), citing Ellis v. United States, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060 (1958). However, when advocacy falls short of that required to render effective assistance of counsel, we have tested for prejudice. See Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Appellant has not directly attacked the adequacy of his representation, “no[r] asserted ... that his defense counsel failed to discuss” trial tactics for sentencing with him. See Lee, supra at 52. However, we will assume that there was a concession, and that the judge erred in not making an inquiry into whether defense counsel’s “better to discharge than confine” argument reflected appellant’s desire. We hold that any error was harmless.
In every case, we ask counsel to determine the odds of what might happen as to the findings or sentence and to structure their arguments based on these probabilities. United States v. Fluellen, 40 MJ 96, 98 (CMA 1994). Appellant’s counsel made a strategic decision at the end of her argument and recognized that if the members “must choose between confinement and a bad-conduct discharge, [they should] give him the punitive discharge.” Appellant faced a heavy maximum punishment, including a dishonorable discharge, 10 years’ confinement, reduction to the lowest enlisted grade, and total forfeitures. Para. 47e(2), Part IV, Manual for Courts-Martial, United States (1998 ed.).
Additionally, the assistant trial counsel recommended a sentence to include a bad-conduct discharge, 12 months’ confinement, total forfeitures, and reduction to the lowest enlisted grade. In light of the prosecution’s argument, trial defense counsel was realistic in her approach by “accepting] ... the force of adverse facts.” Mitchell, supra at 304, 36 CMR at 460.
This case is similar to Volmar, where we recognized that there may be occasions where “there is really no alternative of retention in the service.” 15 MJ at 343. In such circumstances, a tactical concession by trial defense counsel, in support of a client’s rational choice (avoiding confinement), often communicated in the privacy of defense counsel’s office before trial commences, is good courtroom advocacy. Here, appellant portrayed himself as a homosexual for commercial purposes and then, realizing the filming was based on the victim’s sexual predilections, robbed the victim to obtain the video tape. Defense counsel knew that the members would very likely ask themselves, is this the type of individual we want to remain in the service? She would also know that the probabilities were very high that the answer would be “no.” Thus, we conclude that any error based on this apparent concession and the failure of the judge to make an appropriate inquiry was harmless.
*429 The decision of the United States Air Force Court of Criminal Appeals is affirmed.