**UNITED STATES**

v.

**Senior Airman Daryl A. HAMMER,
United States Air Force.**

**ACM 33663 (f rev).**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 24 March 1999.

16 Dec. 2004.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, Major James M. Winner, and William E. Cassara.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Robert V. Combs, and Major Kevin P. Stiens.

Before MALLOY, Senior Judge, JOHNSON, and GRANT, Appellate Military Judges.

## OPINION OF THE COURT UPON FURTHER REVIEW

MALLOY, Senior Judge:

This is the second time this case has come before this Court for review. We previously affirmed the appellant's conviction by a general court-martial for raping and taking indecent liberties with a six-year-old child, indecently exposing himself to a five-year-old child, and possessing child pornography, in

violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934. We also affirmed the appellant's approved sentence of a dishonorable discharge, confinement for 18 years, and reduction to E–1. *United States v. Hammer,* ACM 33663 (A.F.Ct.Crim.App. 25 Feb. 2002) (unpub.op.). Subsequently, the United States Court of Appeals for the Armed Forces (C.A.A.F.) set aside our decision and ordered a limited factfinding hearing. *United States v. Hammer,* 58 M.J. 214 (C.A.A.F. 2003) (mem.). The purpose of this hearing was to address specific questions to the appellant's civilian and military trial defense counsel concerning the appellant's claim that their performance at his trial was constitutionally ineffective.

On 10 September 2003, a factfinding hearing was held at Travis Air Force Base (AFB), California. The appellant was present and represented by his current civilian appellate counsel as well as detailed military defense counsel. Both his former civilian trial defense counsel and his former military trial defense counsel (now a civilian) testified concerning their representation.

After careful review of the record of trial, the record of the factfinding hearing, and the briefs of the parties, we hold that the appellant has failed to overcome the strong presumption that his trial defense counsel performed their professional duties in a constitutionally effective manner. We also hold against the appellant on all other assignments of error, save for his assertion that his plea to possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(A) was improvident in light of the Supreme Court's decision in *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), and our superior court's decision in *United States v. O'Connor,* 58 M.J. 450 (C.A.A.F.2003). But we find that he providently pleaded to the lesser included offense of conduct of a nature to bring discredit upon the armed forces under clause 2 of Article 134, UCMJ. We affirm his conviction on that basis after amending the specification to eliminate reference to the federal statute.

## I. BACKGROUND

This is a child sexual abuse case. Shortly before trial, the appellant and the convening authority entered into a pretrial agreement (PTA) that allowed the appellant to enter mixed pleas to the charges and capped confinement at 18 years. Under this PTA, the appellant pleaded not guilty to rape but guilty to the lesser included offense of committing an indecent act with a child in violation of Article 134, UCMJ. The only contested issue concerning the rape charge was whether the appellant actually penetrated the six-year-old victim's genitalia during the course of his admitted indecent act upon her.

The appellant also pleaded guilty to possessing child pornography in violation of the Child Pornography Prevention Act (CPPA), 18 U.S.C. § 2252A(a)(5)(A), under the terms of the PTA. This latter specification was charged under clause 3 of Article 134, UCMJ, as a noncapital federal offense. He pleaded not guilty to taking indecent liberties with a child under 16 years of age and not guilty to indecently exposing himself to another child in violation of Article 134, UCMJ.

After approving the appellant's request for trial by judge alone, made pursuant to the PTA, and accepting the appellant's guilty pleas as provident, the remaining contested charges were litigated in front of the military judge. Ultimately, the military judge convicted the appellant of all charges and sentenced the appellant to a dishonorable discharge, confinement for 18 years, and reduction to E–1. No relief was required under the PTA. The convening authority approved the sentence as adjudged after considering the appellant's post-trial submissions.

The appellant made several important evidentiary concessions as part of his offer for a pretrial agreement that, inter alia, obviated the need for the in-court testimony of the five- and six-year-old victims of his crimes. This provision is now relevant to our inquiry of his ineffective assistance of counsel claim.

The appellant asserts seven assignments of error: (1) He received ineffective assistance of counsel during all stages of his court-martial (except post-trial), in violation of the Sixth Amendment of the United States Con-

stitution and Article 27(b), UCMJ, 10 U.S.C. § 827(b); (2) His guilty plea to possession of child pornography was improvident because the military judge defined the offense using unconstitutional definitions of child pornography; (3) His plea to possession of child pornography was also improvident because the military judge failed to elicit a sufficient factual basis for an essential element of the offense; (4) The military judge erred by admitting into evidence a confessional stipulation without first conducting a *Bertelson*[1] inquiry; (5) The evidence is factually and legally insufficient to sustain the appellant's conviction for taking indecent liberties with a child; (6) The evidence is factually and legally insufficient to sustain the appellant's conviction for indecent exposure; and (7) The military judge erred by allowing a government expert to testify about the general impact of sexual abuse on victims.

## II. FACTS[2]

### A. The sex offenses

In November 1996, the appellant, his wife, and their two children moved into government quarters on Travis AFB. The appellant's family became close friends with their next-door neighbors, Technical Sergeant (TSgt) W, his wife, LW, and their two children, six-year-old SW and three-year-old JW.

On 6 May 1998, TSgt W's family was preparing to move to Kadena Air Base, Japan. While TSgt W and his wife worked on cleaning their quarters in preparation for their final inspection, the appellant allowed their children, SW and JW, to play with his son and another playmate, JR, in the appellant's home. SW later related that, sometime that afternoon, the appellant entered the bedroom where the children were playing. He had no clothes on and asked her if she wanted to touch his penis. She refused. JR, who was

five years old at the time, also recalled seeing the appellant naked in the computer room (the next bedroom) and hearing the appellant ask SW if she wanted to touch his "wiener." Thereafter, the appellant left to take a shower. As a result of this incident, the appellant was charged with taking indecent liberties with SW and indecently exposing himself to JR.

TSgt W and his wife worked late into the early morning hours cleaning their quarters. The appellant's wife invited TSgt W's family to sleep in the appellant's quarters to spare them a lengthy commute from their in-laws' home, where they had planned to stay the evening. The appellant worked the night shift, and returned to his family quarters at around 0610 on the morning of 7 May 1998. He saw his children sleeping in the living room and a figure asleep on the couch. In fact, SW and JW were both sleeping on the couch. SW was lying on her side facing the back of the couch and was covered with a blanket. JW was lying on the opposite end of the couch. The appellant went to the couch, knelt down, unbuttoned his pants, and exposed his penis. He then lifted the covers, placed his penis between SW's legs, and moved back and forth, rubbing his penis on her genitals until he ejaculated. He then got a towel and wiped his semen off SW's legs, genital area, and stomach. SW was awake during the encounter, but pretended to be asleep.

SW's mother awoke in the appellant's home between 0700 and 0715 and began getting SW ready for school. While in the bathroom with her mother, SW told her that she needed clean underwear because the underwear she had on was wet. In the rush of the day, her mother did not change SW's underwear and did not find out what the appellant had done to her until later in the day. After school, while SW was alone with

1. *United States v. Bertelson,* 3 M.J. 314 (C.M.A. 1977).

2. Some of this background information is taken from this Court's prior decision in this case. *Hammer,* upub. op. at 3. Information developed at the factfinding hearing does not change this factual background. The parties entered into a stipulation of fact concerning the appellant's guilty pleas to committing an indecent act with a

child and possessing child pornography. They expressly agreed that the facts contained in the stipulation of fact were "true and admissible for all purposes including the findings phase of trial." We may, therefore, accept these facts as true and binding on the parties. *See United States v. Glazier,* 26 M.J. 268, 270 (C.M.A.1988); Rule for Courts–Martial (R.C.M.) 811(e).

her mother in the car, she told her mother what had happened. Her mother immediately drove to TSgt W's workcenter and told him about SW's disclosure. After checking SW's vagina for signs of injury and finding redness, she took SW to the emergency room at David Grant Medical Center on Travis AFB. Emergency room personnel called Lieutenant Colonel (Dr.) Stephen Boos, an Air Force pediatrician and an expert in child sexual abuse, to examine SW.

From the start of his examination, it was clear to Dr. Boos that he was dealing with a possible sexual assault and a rape kit would be used during his examination of SW. After conducting a preliminary examination of SW and asking her some general questions, Dr. Boos told her he was going to examine her private parts. SW responded that she knew that because the appellant had rubbed his private parts on her. It was then obvious to Dr. Boos that SW was ready to talk about the incident. Rather than proceed with the physical examination as planned, Dr. Boos asked SW to explain how she knew it was the appellant who assaulted her given that her back was to her assailant. She began by describing not the alleged rape but the incident the preceding day when the appellant asked her if she wanted to touch his penis. She then explained the circumstances of the sexual assault to Dr. Boos. She told him that the appellant had rubbed his private parts between her legs, and that "some sticky stuff came out" and he wiped it off with a wet towel. She also reported that the appellant had pulled her underwear down and that he "bumped up against her and it had hurt twice when he bumped up against her genitals."[3]

Dr. Boos discovered semen in SW's genital area, the creases of her groin, and the area between her labia. He also noted general redness in her vaginal area, and a focalized area of redness in the posterior fourchette, an area near the opening of the vaginal canal. Dr. Boos knew that the focalized redness in

the posterior fourchette was consistent with trauma and could only have been caused by some trauma beyond the labia majora. He testified the posterior fourchette is the area most commonly injured during sexual assault, and to reach it there must be penetration of the genitals.

Both SW and JR were interviewed concerning the incidents of 6 and 7 May 1998. These interviews were videotaped. In her interview, SW described how the appellant came into the bedroom where she, the appellant's son, and JR were playing. The appellant was not wearing any clothes. As SW was looking at his "wiener," the appellant grabbed her arm and told her "if you want to touch it you can." She refused and left the room. In his interview, JR indicated he observed the appellant without clothes on and heard the appellant tell SW that she could "touch his wiener." As to the incident on the following day, SW recalled that as she and JW were sleeping on the couch in the appellant's living room, someone came into the room and pulled her underpants down. This individual put "their thing" between her legs and "went back and forth—then it went up—on my 'gina. Then it hurted really bad." There was "slobbery stuff from the wiener" between her legs and "then somebody wiped them off."

A special agent of the Air Force Office of Special Investigations (AFOSI) interviewed the appellant as a suspect on 8 May 1998. In a sworn statement, the appellant indicated that he returned home from work at 0615. After checking on his children, he joined his wife who was sleeping in the children's bedroom. At no time, according to the appellant, was he alone with any of the children.[4]

On 6 July and 7 October 1998, the United States Army Criminal Investigation Laboratory issued reports confirming the presence of semen in the swabs taken from SW's interlabial fold, her groin area, and on her underwear. Deoxyribonucleic acid (DNA)

---

3. It is not clear from Dr. Boos' testimony whether the appellant pulled SW's underwear down before the assault or afterwards while trying to remove evidence of his crime. However, it is clear from SW's videotaped interview that her underpants were pulled down before the assault. The quoted words are Dr. Boos' and not SW's.

4. The appellant's statement was not admitted at trial. We have considered it solely to place his ineffective assistance of counsel claim in context. *United States v. Holt*, 58 M.J. 227, 232 (C.A.A.F. 2003).

analysis identified the appellant as the source of the semen found on SW's underwear and groin area. The semen found in SW's interlabial fold did not yield sufficient DNA for a conclusive profile. After considering the test results, the appellant sought a PTA.

The appellant's first offer proposed a sentence cap of 12 years.[5] This proposal also required the government to forego prosecution of the rape charge upon acceptance of the appellant's guilty plea to the lesser included offense of committing indecent acts with a child. And, significantly, it was silent on the question of whether SW and JR would be required to testify, although defense counsel's cover letter suggested that obviating the need for the children's testimony would be one of the benefits to the government in accepting the proffered agreement. The convening authority rejected this offer. Subsequently, the appellant submitted a second offer capping confinement at 18 years. Unlike the rejected offer, this offer allowed the government to proceed on the rape charge and contained the following evidentiary concession from the appellant:

> I understand that, as to the offenses to which I have plead not guilty, the government reserves the right to go forward on these charges. As part of this agreement I agree to the introduction of the 11 May 98 videotaped statements of [SW] and the 12 May 98 videotaped statements of [JR]. I further agree to the admissibility of Dr. Stephen Boos' medical records of his examination of [SW], his Article 32 [6] sworn testimony, and the accompanying diagram that he drew at the Article 32 [investigation].

The convening authority accepted this offer.

### B. Child pornography

Authorities searched the appellant's home. The AFOSI seized the appellant's computer and analyzed its memory functions, recovering both saved and previously deleted material. An analysis disclosed a quantity of child pornography on the computer. The appellant was charged with knowingly possessing three or more images of child pornography in violation of the CPPA. As part of the PTA, the appellant offered to plead guilty to this offense.

As required by the PTA, the appellant entered into a stipulation of fact with the government. The parties agreed that the information in the stipulation was true and admissible for all purposes, including findings. Regarding the child pornography, the appellant agreed that: (1) he knowingly possessed pornographic images of children on his home computer; (2) he retrieved from the Internet, and stored on his personal computer, images of females under the age of 18 years with their breasts and/or vaginal areas exposed; (3) of the four images offered as evidence, he knew they were females who were or appeared to be under 18 years of age; and (4) his possession of these images was of a nature to bring discredit upon the armed forces. The appellant twice explained to the military judge how his conduct brought discredit upon the Air Force, stating: "By having these images I believe the general public would think less of the military if they heard about this."

The stipulation of fact also contained the following paragraph concerning Dr. Boos' examination of the four photographs offered in evidence:

> Dr. Stephen C. Boos, Staff Pediatrician at David Grant Medical Center, reviewed Prosecution Exhibits 2–5 and opined that, based on Tanner Staging, the images depicted females under the age of 18. Tanner Staging is a scientific method of determining developmental physical stages for males and females. By studying the breasts and pubic areas of the females in these images, Dr. Boos concluded the following: the female in the white shirt in Prosecution Exhibits 2 and 3 is, at most, in her mid teens and may be about fourteen; the female in Prosecution Exhibit 4 is at most sixteen; and that the female in Prosecution Exhibit 5 is at most in her mid-teens.

---

5. We also consider this document solely to understand the actions of the appellant's defense counsel.

6. Article 32, UCMJ, 10 U.S.C. § 832.

## III. THE FACTFINDING HEARING

In setting aside our first decision, our superior court determined that further inquiry was necessary in light of the appellant's allegations of ineffective assistance of counsel. The court ordered a factfinding hearing under *United States v. DuBay*, 37 C.M.R. 411 (C.M.A.1967), be convened

solely to determine the following matters: (1) defense counsel's reasons for not interviewing Dr. Boos prior to trial; (2) defense counsel's reasons for not interviewing SW prior to advising [the appellant] concerning the admission of her testimony via videotape; (3) defense counsel's reasons for not interviewing SW's mother; (4) defense counsel's reasons for not investigating the possibility of defending against any or all of the charges based on the mother's possible bias in questioning [SW] about the incidents involved after [the appellant] informed defense counsel of the mother's history as a victim of sexual abuse; and (5) defense counsel's reasons for not obtaining expert assistance, expert testimony, or both to counter the conclusion of Dr. Boos as to the cause of the redness in the posterior fourchette.

*Hammer*, 58 M.J. at 214.

Mr. Robert Bowers and then-Captain Michele Lacey represented the appellant at trial. Both testified at the factfinding hearing concerning their representation. Mr. Bowers is an experienced attorney who has served as an Army judge advocate, a senior prosecutor, and a private practitioner. While in the Army, he was both a trial and defense counsel, and chief of criminal law at the division level. At the time of the appellant's trial, he had been involved in at least 12 child molestation cases. Ms. Lacey was an experienced Area Defense Counsel at Travis AFB and entered an attorney-client relationship with the appellant shortly after he became a suspect. At the time, she had defended two child molestation cases and worked previously with two of the expert witnesses in this case.

The military judge made findings of fact and used those findings to answer the five issues posed by our superior court. We re-peat, verbatim, his summarized answers to the court's questions:

a. **Question: Defense Counsel's reasons for not interviewing Dr. Boos prior to trial?** Captain Lacey and Mr. Bowers both testified that they recall conducting telephonic interviews of Dr. Boos. Captain Lacey interviewed Dr. Boos on one occasion, wherein she discussed his examination of SW. Captain Lacey is able to recall specific details of that interview, including the fact that Dr. Boos kept referring her to his written notes of the examination. Mr. Bowers also conducted one, possibly two, telephonic interviews of Dr. Boos regarding his examination of SW, as well as "Tanner [S]taging." Although Captain Lacey or Mr. Bowers could not recall when they conducted their interviews of Dr. Boos, they both were sure that the interviews were done prior to trial. Additionally, Dr. Boos provided testimony at the Article 32 investigation, and was cross-examined by Defense Counsel. Mr. Bowers believed that, prior to trial, he was familiar with the issues surrounding Dr. Boos [sic] examination of SW, including the redness around SW's posterior fourchette. Mr. Bowers believed that he had sufficient information to conduct an effective cross-examination of Dr. Boos during the court-martial. Although somewhat surprised by Dr. Boos [sic] apparently more "definitive" answers at trial, Mr. Bowers believed that he was able to conduct an effective examination on the issue of what had caused the redness on SW's posterior fourchette.

b. **Question: Defense Counsel's reasons for not interviewing SW prior to advising [the appellant] concerning the admission of her testimony via videotape?** Captain Lacey and Mr. Bowers made a tactical decision during the preparation of their defense of the [the appellant] to not interview SW. This decision was made after their review of the videotape and the other evidence in the case, and after discussing the matter with [the appellant]. The Defense was aware that SW, shortly after the alleged incident, had accompanied her family to Japan. They had initially concluded that if any interview

were required, it would have to be conducted in-person. They both reviewed SW's videotape interview, which they felt was consistent with the other physical evidence, and concluded that any benefit of further interviews would be outweighed by any "good will" to be gained by not conducting these interviews. Captain Lacey recalls watching the videotape interview of SW on more than one occasion. She also discussed the videotape with Dr. Ebert, the government's expert witness. Captain Lacey stated that she had worked with Dr. Ebert on previous occasions, that he had testified for both the defense and the government on previous occasions, and that she felt he would provide her with an honest assessment. Mr. Bowers recalls seeing the videotaped interview of SW on several occasions, to include reviewing the videotape with [the appellant]. Mr. Bowers, who knew the individual conducting the interview, viewed the videotape looking for ways to "attack it." Captain Lacey and Mr. Bowers made a tactical decision not to conduct further interviews of SW. They felt that SW's statements were consistent with the physical evidence, and that nothing could be gained from any further interviews. They also felt that there were benefits to be gained by not interviewing SW. These benefits included favorable consideration by the convening authority (when submitting their PTA) and the trier of fact. Mr. Bowers and Captain Lacey discussed the options with [the appellant] and felt that he understood, and agreed, to their decision to not interview SW.

c. **Question: Defense Counsel's reasons for not interviewing SW's mother?** Mr. Bowers and Ms. Lacey both recall interviewing LW, SW's mother prior to trial. Captain Lacey believes that she interviewed LW prior to the Article 32 hearing. Although she does not recall the substance of her interview, she believes that she discussed LW's history of sexual abuse. Mr. Bowers also recalls speaking with LW, although he was reluctant to call it an "interview." They also had the opportunity to cross-examine LW during the Article 32 investigation.

d. **Question: Defense Counsel's reasons for not investigating the possibility of defending against any or all of the charges based on the mother's possible bias in questioning SW about the incidents after [the appellant] informed Defense Counsel of the mother's history as a victim of sexual abuse?** Mr. Bowers and Captain Lacey were aware that LW might have been the victim of sex abuse. They also explored the possibility of "exploiting" this at trial but, after reviewing the totality of the evidence, they determined there was no advantage to be gained. They did not believe the evidence supported a conclusion that her mother had influenced any of SW's testimony. The Defense was more concerned with the physical evidence surrounding the incident, which they felt was consistent with SW's statements. Mr. Bowers was adamant that he could not see any advantage to be gained by using LW's history of sexual abuse to defend [the appellant] against any of the charged offenses.

e. **Question: Defense Counsel's reasons for not obtaining expert assistance, expert testimony or both to counter the conclusion of Dr. Boos as to the cause of the redness in the posterior fourchette?** According to the Defense, they only made a request for an expert in serology to assist them with the DNA evidence. They made no request for expert assistance to counter Dr. Boos' conclusion on what caused the redness to [the] posterior fourchette. Mr. Bowers stated that he felt comfortable with the issue and felt that he was able to effectively cross-examine Dr. Boos about alternative causes.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Issues

The appellant has raised nine allegations of ineffective assistance of counsel extending to the pretrial, trial, and sentencing phase of his court-martial. First, he alleges trial defense counsel failed to adequately interview Dr. Boos prior to trial and failed to adequately investigate and defend against his expert testimony. Second, defense counsel failed to

interview SW before trial and so were unable to competently investigate, advise, and defend the appellant against her allegations. Third, defense counsel failed to investigate the possibility of defending against any or all of the charges based on the mother's possible bias in questioning SW about the incident after the appellant informed the trial defense counsel of the mother's history as a victim of sexual abuse. Fourth, defense counsel failed to obtain expert assistance and/or testimony to counter Dr. Boos' testimony as to the cause of the redness of SW's posterior fourchette. Fifth, defense counsel were deficient in stipulating to Dr. Boos' testimony that used Tanner Staging to determine the chronological ages of the females depicted in four photographs of child pornography.[7] Sixth, defense counsel formulated and went forward with the appellant's defense on a clearly erroneous belief that his testimony from the providence inquiry on his guilty plea to committing an indecent act upon SW would be admissible during trial on the contested rape charge. Seventh, defense counsel were deficient in stipulating to the admissibility of inaccurate medical photographs taken by Dr. Boos during his examination of SW. Eighth, defense counsel failed to conduct adequate research into whether the websites the appellant viewed actually contained child pornography.[8] Ninth, there is more than a reasonable probability, that, absent defense counsel's numerous errors, the appellant would have obtained a more favorable result at trial. We combined our review of several of these issues in our discussion of defense counsel's performance.

### B. Law

A military accused has a constitutional and codal right to the effective assistance of counsel during all stages of the court-martial process. U.S. CONST. amend. VI; Article 27(b), UCMJ; *United States v. Bolkan*, 55 M.J. 425 (C.A.A.F.2001). The essence of effective assistance of counsel is the right to be represented by lawyers who

are functioning as advocates during all stages of the adversarial process. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We do not focus on the claimant's dissatisfaction with counsel's performance, however critical that may be, or on the outcome of the case. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Our focus, instead, is on the reliability and fairness of the adversarial process. As the Supreme Court has stated: "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Id.* at 369, 113 S.Ct. 838 (quoting *Nix v. Whiteside*, 475 U.S. 157, 175, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986)).

In addressing claims of ineffective assistance of counsel in military prosecutions, we apply the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F.2000). Under *Strickland*, the appellant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. In order to demonstrate deficient performance, the appellant must identify specific acts or omissions that rendered defense counsel's performance "outside the wide range of professionally competent assistance" that could have been provided in any given case. *Id.* at 690, 104 S.Ct. 2052. To demonstrate prejudice, the appellant must show that, but for his counsel's errors, there is a "reasonable probability" that the results of his court-martial would have been different. *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In assessing counsel's performance, we must be ever mindful that "[t]he Sixth Amendment guarantees reasonable competence, not perfect

---

7. This issue is framed incorrectly. The appellant did not enter into a stipulation of expected testimony concerning Dr. Boos' opinion. Instead, he entered into a stipulation of fact, as required by the pretrial agreement, which accepted Dr. Boos' opinion as the factual predicate for the ages of the girls. There is a significant difference between a stipulation of expected testimony and a stipulation of fact. *See* R.C.M. 811.

8. This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 7, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003).

An ineffective assistance of counsel claim presents a mixed question of fact and law. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F.2001). We review the *DuBay* hearing military judge's findings of fact for clear error. We review de novo whether under those facts the appellant received effective assistance of counsel. *United States v. Burt*, 56 M.J. 261, 264 (C.A.A.F.2002). In undertaking this task, we apply a strong presumption that counsel were effective. *United States v. Ingham*, 42 M.J. 218, 223 (C.A.A.F.1995). And our review must be "highly deferential" so as not to interfere with their constitutionally-protected independence. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Under military precedent, we must address three questions in determining whether the appellant has overcome this strong presumption of effectiveness:

(1) Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions?";

(2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance ... [ordinarily expected] of fallible lawyers?"; and

(3) If defense counsel was ineffective, is there a "reasonable probability that, absent the errors," there would have been a different result?

*Grigoruk*, 56 M.J. at 307 (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

We find no clear error in the *DuBay* hearing military judge's findings of fact and rely on those facts, as supplemented by our independent review of the entire record, to address the appellant's claim. *See* Article 66(c), UCMJ, 10 U.S.C § 866(c); *United States v. Armstrong*, 54 M.J. 51, 54 (C.A.A.F. 2000) (under Article 66, UCMJ, we review the entire record de novo to determine which findings and sentence shall be approved as correct in law and fact).

## C. Discussion

The appellant has launched an all-out assault on every aspect of defense counsel's performance in his quest to find error in what is an otherwise straightforward mixed plea, judge-alone case with a favorable PTA. *See United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F.2000) ("To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution") (quoting *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring)). After a careful review of each of the appellant's claims, we find that he has failed to clear the "very high hurdle" created by *Strickland* and the precedents of our superior court. *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F.1997).

Before turning to the errors of counsel identified by the appellant, we address two common themes of the appellant. First, we reject his claim of cumulative error. Although we agree with the proposition that it may be possible in some cases to aggregate otherwise harmless mistakes of counsel to establish cumulative prejudice, this is not such a case. This argument assumes that each individual act or omission identified by the appellant was an error in the first instance. Since we do not find that any of defense counsel's actions fall below the performance expected of fallible attorneys, there is nothing for us to aggregate. We cannot combine non-errors to find cumulative error. *United States v. Gauvin*, 173 F.3d 798, 804 (10th Cir.1999).

Second, we reject the appellant's logic that, assuming arguendo prejudicial error, he is necessarily entitled to have all the findings and the sentence set aside, regardless of the stage of trial in which the error(s) occurred. This approach overlooks the fact that this is a mixed-plea case. Setting aside the appellant's guilty pleas for an error of counsel unrelated to those guilty pleas would provide him with a windfall that the *Strickland* test was designed to foreclose. *Lockhart v. Fretwell*, 506 U.S. at 369–70, 113 S.Ct. 838. Even if we were to agree with the appellant's argument that his defense counsel failed in some manner, we would not set aside his guilty pleas absent a showing of prejudice affecting those pleas. *United States v. Ginn*, 47 M.J. 236, 247 (C.A.A.F.1997) (the appel-

lant must show there was a "reasonability probability" that he would have pleaded not guilty but for counsel's errors).

■ The appellant's complaint with counsel's performance begins with their pretrial investigation. The appellant alleges, inter alia, that his defense counsel failed to adequately interview key witnesses, and fully investigate and research his case. Defense counsel, of course, have an ethical obligation to properly investigate the charges against their client in formulating trial strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). This duty extends to interviewing witnesses or making reasonable tactical decisions rendering some interviews unnecessary. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The failure to conduct a proper investigation can, in some cases, result in ineffective assistance of counsel if the failure precludes the proper functioning of the adversarial system. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. *See also United States v. Alves*, 53 M.J. 286 (C.A.A.F.2000) (failure to interview key witnesses rendered counsel's performance deficient but did not prejudice the appellant); *United States v. Scott*, 24 M.J. 186 (C.M.A.1987) (failure to investigate alibi defense and prepare for trial was ineffective). But, in reviewing counsel's actions, we must also recognize there are just as many ways to investigate and prepare a case for trial, as there are to defend against a particular charge or charges. And all of these ways can fall within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In short, there is no requirement for defense counsel to interview every potential witness in a case.

What defense counsel must do, then, is undertake a reasonable investigation or make a "reasonable decision that makes particular investigations unnecessary." *Id.* at 690–91, 104 S.Ct. 2052; *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527. If defense counsel's pretrial decisions were the product of sound tactics or strategy, we will not second guess those decisions. *Grigoruk*, 52 M.J. at 315. *See also Simmons v. Iowa*, 28 F.3d 1478 (8th Cir.

1994) (decision not to present a defense was the product of a reasoned tactical decision and virtually unassailable). And we judge the reasonableness of those decisions at the time they were made, not on how they now appear to us in hindsight. *Moulton*, 47 M.J. at 229 (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Against this backdrop, we turn to the appellant's grievances with defense counsel's performance.

■ First, we find that defense counsel's decision not to interview SW was the product of an informed decision made after reasonable investigation and consultation with the appellant. The appellant describes this decision as the most striking evidence of defense counsel's incompetence. He is correct in his assertion that neither defense counsel interviewed SW before trial, but he is wrong when he asserts that this decision was not an informed tactical choice based on a trial strategy to which he personally assented. Our first point of inquiry in addressing counsel's decision not to interview SW is whether their trial strategy was a reasonable one "supported by the law and evidence." *Ingham*, 42 M.J. at 224. It clearly was.

A pediatrician experienced in child sexual abuse cases examined SW on the day of the assault and found nearly incontrovertible evidence that she had been the victim of a serious sexual assault. She was interviewed shortly after the assault and the interview was videotaped. During the interview, she provided a graphic description, in the language of a six-year-old, of how the appellant had asked her to touch his "wiener" while naked and how she had been sexually assaulted the next day. Her description of the sexual assault was consistent with the medical examination and our own review of the videotape leads us to conclude she provided a compelling explanation of the events. We also note the appellant's civilian defense counsel, Mr. Bowers, was familiar with the interviewer. He watched the videotape six times, including with the appellant. Likewise, Captain Lacey watched the videotape on a number of occasions, and she discussed it with Dr. Bruce Ebert, a forensic psychologist acting as the government expert in the case. Although he was a government expert

in this case, Dr. Ebert had worked for both the government and the defense. Captain Lacey had a history of working with him and enjoyed a good professional relationship with him. She found him to be forthright in answering her questions about the videotape. As she recalled, Dr. Ebert was impressed with the quality of SW's interview. He told Captain Lacey that the defense would have an "uphill" battle overcoming it, a conclusion that became even more apparent as the case developed.

Approximately two months after the offenses, the appellant was identified through DNA analysis as the source of the semen found on SW's underwear and groin. To say this evidence was damaging to the appellant's sworn denial of wrongdoing is an understatement. It was at this point that any hope that the appellant's pretrial denial was a viable defense to the allegation vanished. Defense counsel thereafter focused on a strategy that allowed them to do damage control but at the same time allowed them to litigate the issue of penetration, as the appellant desired. This strategy also provided the appellant with the incentive he needed to persuade the convening authority to accept his second PTA offer and to garner some good will during sentencing based on his decision to spare the children from further trauma.

The defense counsel did not initially interview SW because she was not available for an in-person interview. SW was raped on the day her family was clearing base housing. Captain Lacey believed that if she was to be interviewed, it was imperative that it be done in person. But as the evidence unfolded and their trial preparation progressed, they made an informed, tactical decision not to interview either SW or JR, and sought to avoid their live testimony.

Both defense attorneys viewed the physical evidence as their biggest obstacle in defending against the rape charge. Not surprisingly, this evidence was the focal point of their pretrial investigation. They obtained the appointment of an expert consultant in serology to assist them with the DNA evidence, but this line of investigation was not fruitful. Mr. Bowers then concluded there was little to be gained in interviewing SW in light of the physical evidence and the quality of her videotaped interview. In fact, he believed that such an interview carried greater risks for the defense than possible benefits. As he explained:

> That information, according to our expert and the government's expert, came back that this was a properly performed exam that rendered a result showing that this substance was, in fact, [the appellant's]. Knowing that, knowing that we had a six-year old girl who made a report within that day that this occurred, knowing that we had reviewed an interview of the child. We had a videotaped interview of what she had to say. We had the reporting of the incident that day coupled with DNA evidence. I felt there was very little value in interviewing this child. I figured if she said it did happened [sic], the government would just put on the videotape to rehabilitate her and then they would have put on the scientific evidence. So, I don't think that would have helped us. If she said more things happened, if she said that he actually "entered me," that would have been bad for us. "Us" meaning the defense. If she had said, "I don't remember," there wouldn't have been any advantage. We also from a strategic point of view, wanted to keep the child off of the stand and out of court.

The appellant was adamant that he did not penetrate SW during the sexual assault upon her. And he desired to litigate that issue. But at the same time, he was interested in obtaining the protection of a PTA. His defense counsel successfully pursued a strategy that allowed him to achieve these twin objectives. They secured a PTA that capped confinement and allowed them to litigate the rape charge.

Child abuse cases are difficult to defend. *United States v. Banks,* 36 M.J. 150 (C.M.A. 1992). Defense counsel and their clients are faced with tough choices. We find that defense counsel's decision not to interview SW was part of a reasonable trial strategy. Viewed from counsel's perspective at the time, this strategy fell well within the range of professionally competent assistance ex-

pected of fallible lawyers. *Grigoruk,* 56 M.J. at 307.

■ We further find that defense counsel's interviews of Dr. Boos were adequate. They were not required to obtain expert assistance to be constitutionally effective. Our superior court remanded this case for a *DuBay* hearing based, in part, upon the appellant's assertion that defense counsel failed to interview Dr. Boos. We now know that this assertion is untrue. In fact, as the military judge presiding over the *DuBay* hearing found, both defense counsel interviewed Dr. Boos before trial and had the opportunity to cross-examine him at the Article 32 investigation. The appellant acknowledges this to be true and now alleges defense counsel's interviews of Dr. Boos were constitutionally inadequate. We disagree.

We start with the strong presumption that defense counsel were competent and their decisions concerning Dr. Boos were the product of an adequately informed trial strategy. *Ingham,* 42 M.J. at 223; *Bullock v. Carver,* 297 F.3d 1036 (10th Cir.2002), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 703, 154 L.Ed.2d 640 (2002). We do not review this issue in a vacuum. Instead, we review counsel's decisions in the context of the evidence against the appellant and their chosen trial strategy. The appellant, protected by the PTA, decided to plead guilty to committing indecent acts with SW as a lesser included offense of rape. Before trial, and as required by the PTA, he stipulated to all facts necessary to prove the offense of rape except the element of penetration. The decisions to enter into this PTA and stipulation of fact and to plead guilty were the appellant's, not counsel's, to make. *Bolkan,* 55 M.J. at 428. Pretrial documents disclosed by defense counsel establish the appellant was advised of and understood his options.

Mr. Bowers had a simple and straightforward strategy for cross-examining Dr. Boos to establish a reasonable doubt as to whether the appellant penetrated SW at the time he placed his penis between her legs and moved it back and forth until ejaculating. He understood the issue, and he made the points he needed to make during cross-examination. That this strategy failed to carry the day

does not mean that his efforts were ineffective. Holding the government to its burden of proof can be a reasonable trial strategy in a case, where, as here, the evidence of guilt is overwhelming and the appellant has elected not to present a defense beyond holding the government to its heavy burden. *Cronic,* 466 U.S. at 657 n. 19, 104 S.Ct. 2039 (If an accused elects to stand trial, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt even when no theory of defense exists).

Here, the defense counsel had a difficult task in overcoming the physical evidence and SW's compelling description of someone putting their "wiener" between her legs, until it felt "slobbery." As counsel made clear at the *DuBay* hearing, there was no realistic way to defend against the physical evidence. In light of this evidence, we find that defense counsel had a reasonable strategy on how to deal with the issue of penetration, and that defense counsel's advocacy did not fall below the performance expected of reasonably prepared lawyers.

■ Next, we consider and reject the appellant's claim that his defense counsel were ineffective in implementing their strategy because they failed to seek the assistance of an expert consultant to counter Dr. Boos' opinion. To begin with, there is no rule of law that requires a defense counsel to seek the assistance of an expert simply because the government is presenting expert testimony in its case. Defense counsel are, of course, entitled to expert assistance as a matter of military due process upon a showing of necessity. *United States v. Garries,* 22 M.J. 288 (C.M.A.1986). But they also have a concomitant responsibility to attain competency on a particular subject matter through their own efforts and self-education. *United States v. Short,* 50 M.J. 370 (C.A.A.F.1999). It is only when they show they are unable to gather and present evidence without expert assistance that there is a due process entitlement to the appointment of an expert. *Short,* 50 M.J. at 373.

Here, it is clear that defense counsel understood the requirements for the appointment of a government-funded expert, as well

as their ability to obtain expert assistance without government help. They successfully petitioned the convening authority for the appointment of a confidential expert consultant to assist them with the DNA analysis of the semen found between SW's legs and on her underwear. They also obtained, with their own resources, a psychological evaluation of the appellant. Although we are not privy to the opinions of these experts, we do know as a result of the *DuBay* hearing that they were not helpful to the defense. Nonetheless, counsel's actions shed light on how the defense counsel lived this case as they prepared for trial. We find that they had a clear strategy, which they executed competently.

The question before us is not whether the defense counsel could have found some expert, somewhere, that supported their position. Instead, it is how they chose to deal with Dr. Boos' testimony. After trial, the appellant procured an affidavit from a Dr. Barbara Craig to demonstrate that it would have been possible to obtain expert testimony supporting his position that the redness of SW's posterior fourchette could have been caused by something other than penetration by the appellant's penis, including the washcloth the appellant used to remove his semen from between her legs. But this is precisely the point that defense counsel sought to make and did make through cross-examination of Dr. Boos. As Mr. Bowers explained, he understood that he "could have gotten a pediatrician to come in and say the same thing" that Dr. Boos acknowledged on cross-examination, that the redness "could have been from other sources." The fact that counsel elected to make this point through cross-examination of the examining physician, rather than a retained or appointed defense expert who played no role in examining SW after the rape, does not render defense counsel's decision unreasonable or his performance outside the range of professionally competent assistance. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

But even if we assume a deficiency on the part of defense counsel, we find that the appellant has failed to meet the second prong of *Strickland* and has not shown prejudice. The decision not to seek expert assistance—other than by interviewing Dr. Boos—did not render the result of the trial unreliable or unfair. *Lockhart v. Fretwell*, 506 U.S. at 372, 113 S.Ct. 838. Dr. Boos was an extremely qualified medical expert in child sexual abuse. But more importantly, he, unlike any expert the appellant could have called, however qualified, was the physician who conducted the emergency room examination of SW. Thus, he was not only providing expert testimony, he was also providing first-hand evidence based on his examination of SW following the rape. And Dr. Craig's affidavit does not call into question Dr. Boos' opinion. Under these circumstances, there is no reasonable probability that her testimony would have changed the outcome of this case. We consider the defense counsel's performance in light of the "strength of the government's case" and find that it was not ineffective. *United States v. Rivera*, 900 F.2d 1462, 1474 (10th Cir.1990), *cert. denied*, 540 U.S. 1210, 124 S.Ct. 1486, 158 L.Ed.2d 135 (2004).

█ Next, we find that defense counsel were not ineffective because they failed to investigate the possibility of defending against "any or all" of the charges based on LW's possible bias.[9] The appellant argues that his counsel were ineffective because they failed to investigate the possibility of defending against any or all of the charges based on the fact that SW's mother, LW, had also been sexually abused. There is little information in the record about this abuse. But it is clear that both defense counsel were aware of it and considered whether it could be of any use in defending the appellant. The appellant told them about it and LW had made comments about it as early as the Article 32 investigation. Mr. Bowers spoke with LW before trial and Captain Lacey believed she did too.[10]

---

9. We have sua sponte reconsidered the appellant's motion to file the declaration of Dr. Mark Whitehill, a licensed psychologist retained by the appellant after trial. The document is admitted and has been considered on this issue.

10. Captain Lacey attempted to cross-examine LW about this abuse during sentencing, but the military judge sustained the government's objection to her questions based on relevancy.

Both defense counsel explored the possibility of using this evidence in defending the appellant. Both concluded that, given the physical evidence, there would be no tactical benefit in attempting to exploit LW's past. As Captain Lacey explained:

Co-counsel and I reviewed the evidence. As a result of the totality of the evidence, I was of the opinion that regardless of [LW]'s past, the physical—the fact of the semen having been identified and confirmed through DNA testing as that of Airman Hammer and the location of where it was, between [SW]'s legs was significant with regard to those charges. And with regard to the indecent exposure, the fact that other children, unrelated to [SW's family]—specifically [JR]—retold substantially similar occurrences. So I was not persuaded of the tactical benefit of exploiting [LW]'s past.

It is clear from the *DuBay* hearing that the appellant is simply wrong when he broadly asserts that his counsel did not consider LW's background in preparing the appellant's defense. Their decision not to use this evidence (other than in sentencing) made good sense and was reasonable in light of their overall trial strategy.

As noted, the appellant has broadly framed this issue of ineffective assistance of counsel to include "any or all" of the charges against him, including the two offenses to which he pleaded guilty. Unlike the appellant, we believe it is necessary to examine separately his claim in respect to the offenses to which he pleaded guilty and those to which he pleaded not guilty.

We begin with the guilty plea offenses. There is simply no reasonable probability that the evidence of LW's history as a victim of sexual abuse would have made any difference in regard to these offenses. *See United States v. Quick*, 59 M.J. 383 (C.A.A.F.2004) (there is no particular order in which we are required to apply *Strickland* and may dispose of a claim on lack of prejudice if it is easier to do so). First, there was no connection between the appellant's child pornography and SW. As he acknowledged in his post-trial statement to the convening authority, "the teen pornography has no relation to the indecent act upon SW." Under these circumstances, there is no way that information about LW's tragic past could have helped him defend against the charge of possessing child pornography. The appellant has offered nothing to suggest otherwise.

We reach the same conclusion in respect to the appellant's guilty plea to committing an indecent act upon SW. Truth matters under military law. Guilty pleas are made under oath and "must be in accord with the truth" before they are accepted. R.C.M. 910(d), Discussion; *United States v. Care*, 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969). We have closely examined the providence inquiry and find no reason to question the truthfulness of the appellant's testimony. We will not allow him to now use his claim of ineffective assistance of counsel to invalidate his guilty pleas. *Ginn*, 47 M.J. at 244–45.

At best, his argument boils down to the assertion that there is a possibility that he could have obtained a better result had his counsel used the information of LW's abuse as a child to defend against the charges. This argument says nothing about the truthfulness of his judicial confession during the providence inquiry. And it is precisely this type of argument the Sixth Amendment rejects. As the Supreme Court noted in *Lockhart v. Fretwell*, "Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." 506 U.S. at 369, 113 S.Ct. 838 (quoting *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039). That the appellant now believes his guilty pleas were a mistake, and that he could have got a better result, does not call into question the fairness or reliability of those pleas. We do not find a substantial basis to question the providence of the appellant's guilty pleas based on defense counsel's failure to investigate or use evidence of LW's history as a victim sexual abuse. *United States v. Jordan*, 57 M.J. 236 (C.A.A.F.2002).

We next consider the appellant's assertion that LW's past could have been used to defend against the contested charges. Again, we find that defense counsel's decision not to use this evidence was part of a reasonable trial strategy. Defense counsel's testi-

mony makes clear that there were two reasons why they rejected use of this evidence. First, such an approach was not compatible with their approach in defending against the rape charge. That approach focused solely on contesting the issue of penetration and not on directly attacking SW's credibility. Defense counsel determined that evidence concerning the past sexual abuse of LW would not have advanced this strategy. Nor would it have done much to advance the appellant's overall strategy of being able to take credit during sentencing for avoiding further trauma to the children he victimized.

Second, it appears that Captain Lacey recognized that an indirect attack on SW's credibility via her mother was not a sound strategy for another obvious reason. In addition to SW, they also had to deal with the testimony of five-year-old JR. His testimony supported not only the indecent exposure charge of which he was the victim but also the indecent liberties charge involving SW, which he witnessed. These offenses occurred in the appellant's home on the day prior to the rape. Nothing about LW's past sexual abuse was relevant to JR's testimony, and it is a stretch beyond credulity to suggest that it could have been successfully used to attack his credibility. It also appears defense counsel recognized that, given the temporal proximity of all of the offenses, JR's testimony would likely have been independently relevant and admissible to support the rape charge under Mil R. Evid. 404(b), had they chosen to challenge SW's account of events based on her mother's unfortunate background. See generally United States v. Kerr, 51 M.J. 401 (C.A.A.F.1999) (there is no danger of improper spillover from joined offenses when the evidence of one charge is admissible to prove another charge).

■ We hold that defense counsel were not ineffective in failing to investigate or use evidence of LW's past sexual abuse. We also hold that defense counsel were not ineffective in entering a stipulation of fact that included the opinion of Dr. Boos concerning the ages of the females depicted in the four images of child pornography the appellant pleaded guilty to possessing. Dr. Boos reached this conclusion using Tanner Staging (also known as Tanner Scales).

The appellant now tells us "Dr. Boos' testimony is simply false." He bases this assertion entirely on a two-paragraph letter authored by Drs. Rosenbloom and Tanner. Arlan L. Rosenbloom & James M. Tanner, Letter to the Editor, *Misuse of Tanner Puberty Staging to Estimate Chronologic Age*, 102 PEDIATRICS 1494 (1998). In this letter, Drs. Rosenbloom and Tanner wrote that Tanner Staging was not designed for estimating chronologic age. Instead, it was designed to estimate development or physiologic age. They cautioned physicians against using this method to estimate the ages of children depicted in child pornography.

The appellant now claims his guilty plea to possessing child pornography should be set aside because it was based upon his counsel's advice that the use of Tanner Staging by Dr. Boos legitimately established that the females in his pornography were below 18 years of age. We disagree.

Before discussing the appellant's assertions concerning Tanner Staging, we clarify two points. First, it is not accurate to say that this was a stipulation of expected testimony. In fact, Dr. Boos' opinion was part of a stipulation of fact that was required by the PTA. The parties agreed that the facts contained in the stipulation were "true and admissible for all purposes, including the findings portion of trial." This language means exactly what it says and makes clear the "full agreement and understanding of the parties." *Glazier*, 26 M.J. at 270. Unlike a stipulation of expected testimony, defense counsel were not free to challenge this information without the risk of losing the appellant's PTA. We point this out to make clear that the issue before us is not the admissibility of Tanner Staging in a litigated case but whether it was ineffective for counsel to enter this stipulation of fact as part of a trial strategy that provided substantial benefits to the appellant. In our view, it clearly was not. Defense counsel may stipulate to the admission of inadmissible evidence as a part of a PTA without the risk of being labeled ineffective. *Id.* Second, we believe the appellant's post-trial statement that he relied on Dr. Boos'

opinion in concluding that his conduct was unlawful is self-serving and untrue. This position is contradicted by his sworn testimony during the providence inquiry.

The appellant began the guilty plea inquiry with the military judge by explaining that he started looking at child pornography when he came across "teen sites" while browsing for other pornographic web sites. He went to these teen sites and downloaded "pictures of what appeared to be females under the age of eighteen. They were sexual in nature and intended to be sexually suggestive or inviting. They depicted females with their breasts and pubic areas exposed." The military judge carefully questioned the appellant to as to why he believed he knowingly possessed child pornography. It is clear from the military judge's exceptionally thorough inquiry that the appellant did not need expert help to know he was viewing child pornography and it was unlawful for him do so.

We next turn to the appellant's claim that the cited Rosenbloom and Tanner letter rendered Dr. Boos' opinion "false." We, of course, do not decide whether a properly qualified expert can express an opinion as to the age of children appearing in child pornography using Tanner Staging. That is not the issue before the Court. It is the military judge, not us, that serves as the gatekeeper for the admission of expert testimony. *United States v. Quintanilla*, 56 M.J. 37, 84 (C.A.A.F.2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). We review the military judge's performance of this gatekeeping role for an abuse of discretion. *United States v. Traum*, 60 M.J. 226 (C.A.A.F.2004). Here, we simply do not know how the military judge would have exercised his discretion had the parties not agreed that Dr. Boos' opinion was "true and admissible for all purposes."

Against this backdrop, we find the appellant's argument to be without merit. First, this argument simply ignores the fact that Dr. Boos may very well disagree with his

colleagues based on his own professional training and expertise. Professional disagreement does not render an expert's opinion false. Second, the appellant's assertion—indeed, his entire argument on this issue—ignores state and federal case law accepting expert testimony on the ages of children depicted in child pornography. This case law establishes that, contrary to the appellant's position, courts do admit such evidence, including expert opinions using Tanner Staging. *See United States v. Hilton*, 386 F.3d 13 (1st Cir.2004) (court notes without disapproval expert testimony using Tanner Scale to establish ages of children); *United States v. Katz*, 178 F.3d 368 (5th Cir.1999) (trial court did not abuse its gatekeeping functioning in limiting expert to Tanner Staging methodology); *United States v. Nolan*, 818 F.2d 1015, 1018 (1st Cir.1987) (pediatrician allowed to testify "that the bodily traits of the individuals in the photographs were those of minors, many of them prepubescent minors");[11] *Padgett v. United States*, 302 F.Supp.2d 593 (D.S.C.2004) (testimony of FBI special agent with 15 years of experience dealing with images of child pornography and trained in estimating the age of children accepted by the court); *Roise v. State*, 7 S.W.3d 225 (Tex.App.1999) (pediatrician allowed to testify as to the ages of children in 28 photographs using the Tanner Staging methodology).

*United States v. Pollard*, 128 F.Supp.2d 1104 (E.D.Tenn.2001), is directly adverse to the appellant's position that the Rosenbloom and Tanner letter to the editor renders, *ipse dixit*, inadmissible the testimony of any pediatrician who may disagree with them, let alone renders such testimony false. In *Pollard*, the district court agreed that an experienced pediatrician was a qualified expert in the area of pubertal development of children and could testify as to the age of a female appearing in a pornographic videotape. This expert opinion was based, in part, on Tanner Staging. There, the defendant objected to the expert's testimony based on the same letter that the appellant now relies upon to

---

**11.** We note that the *Hilton* court questioned the *Nolan* holding, but neither *Hilton* nor *Nolan* questioned the admissibility of Tanner Staging as a way to establish the ages of children depicted

in child pornography. Rather, both cases involve the question of what proof is necessary to establish the children are, in fact, real.

establish ineffective assistance of counsel. As the court noted in *Pollard*, this letter hardly tells the whole story.

> The letter from Drs. Rosenbloom and Tanner precipitated a scholarly discussion between physicians in the journal Pediatrics, resulting in a separate letter from Dr. Rosenbloom explaining that neither he nor Dr. Tanner intended to imply that physicians refrain from providing expert testimony in suspected child pornography cases, only that they should refrain from providing testimony as to chronologic age based on Tanner staging. In fact, Dr. Rosenbloom wrote there is a real question as to whether the Tanner scale should be used at all in determining chronologic age because the expert pediatrician comes to the evidence with the ability to estimate age based on facial appearance, body shape, muscular development, and sexual maturation.

*Pollard*, 128 F.Supp.2d at 1122. According to the court, Dr. Rosenbloom agreed that it is the consensus among physicians that the Tanner Scale is one of several criteria that could be part of a global assessment of the chronologic age of a child in pornography.

We arrive at three conclusions. First, it was not ineffective assistance for defense counsel to enter a stipulation of fact containing the opinion of Dr. Boos as part of the quid pro quo for the PTA. Second, the appellant has failed to show a reasonable probability that, but for his defense counsel's advice regarding the stipulation of fact, he would have pleaded not guilty to possessing child pornography. *Ginn*, 47 M.J. at 247. Third, there is no basis for the appellant's assertion that his counsel stipulated to false testimony.

A final matter remains before moving to the appellant's next claim. Only four pornographic images of children were introduced at trial. At the *DuBay* hearing, Mr. Bowers explained that not all of the child pornography seized from the appellant was introduced at trial. The four images admitted were admitted as part of the PTA. The appellant now alleges that this is evidence of a sub rosa agreement because there was no term in the PTA indicating that only these four images would be introduced. This, according to the appellant, is further evidence of his counsel's ineffectiveness. We find this assertion to be without merit. The PTA required the appellant to enter a reasonable stipulation of fact. That defense counsel were able to negotiate a favorable stipulation that excluded other child pornography is not evidence of a sub rosa agreement, and certainly not one unfavorable to the appellant.

We have considered the appellant's remaining claims of ineffective assistance of counsel, including those raised pursuant to *United States v. Grostefon*, and find that he has failed to meet his heavy burden of proof.

## V. GUILTY PLEA TO POSSESSING CHILD PORNOGRAPHY

 We agree with the appellant that his guilty plea to possessing child pornography in violation of 18 U.S.C. § 2252A was improvident. In advising the appellant of the elements of the offense, the military judge used definitions of child pornography ("appears to be" and "conveys the impression") that were subsequently found unconstitutional by the Supreme Court in *Ashcroft v. Free Speech Coalition*. This was error, and the appellant's plea to the offense as charged cannot stand. *O'Connor*, 58 M.J. at 450. But we find that his plea can sustain a finding of guilty as to the lesser included offense of service discrediting conduct. *United States v. Mason*, 60 M.J. 15 (C.A.A.F.2004); *United States v. Anderson*, 60 M.J. 548 (A.F.Ct. Crim.App.2004), *pet. denied*, 60 M.J. 403 (2004).

The appellant stipulated that his possession of child pornography was service discrediting. The military judge properly defined service discrediting conduct and thereafter discussed in detail the reasons why the appellant believed his conduct was unlawful and service discrediting. After examining the images and after reviewing the guilty plea colloquy, we find that the appellant providently pleaded guilty to a lesser included offense under clause 2 of Article 134, UCMJ. We will amend the specification in our decretal paragraph. In light of this holding, we find it unnecessary to discuss the appellant's related assertion that the military judge failed to adequately address an element of the federal offense.

## VI. CONFESSIONAL STIPULATION

The appellant claims the military judge erred in admitting into evidence a confessional stipulation without conducting the inquiry and advisement required by *United States v. Bertelson*. We disagree.

■ Article 45(a), UCMJ, 10 U.S.C. § 845(a), bars acceptance of a guilty plea if an accused "sets up matter inconsistent with the plea" or enters a plea improvidently or through lack of understanding of its meaning and effect. Before accepting a guilty plea, the military judge must advise the accused, inter alia, of the nature of the offense, the possible penalty, the right to plead not guilty, the right to a trial by a court-martial, and the right to counsel. R.C.M. 910(c). A stipulation is confessional when it amounts to a de facto guilty plea and may not be accepted unless the accused has first knowingly, intelligently and voluntarily consented to its admission. A stipulation "which tends to establish, by reasonable inference, every element of a charged offense does not practically amount to a confession if the defense contests an issue going to guilt which is not foreclosed by the stipulation." R.C.M. 811(c), Discussion. *See also United States v. Honeycutt*, 29 M.J. 416, 419 (C.M.A.1990).

■ We find the ·stipulation of fact was not a confessional stipulation to the offense of rape because it did not admit, directly or by inference, that the appellant "penetrated" the victim's sexual organ. Specifically, the parties stipulated that the appellant rubbed his penis "on" the victim's genitals. Thus, they did not stipulate to any penetration of the female sexual organ. It is clear this is what the parties intended—the appellant even signed a memorandum to that effect before the trial. His understanding of the stipulation is entitled to weighty consideration. *United States v. Cambridge*, 12 C.M.R. 133, 140, 1953 WL 2195 (C.M.A.1953). Moreover, the appellant specifically litigated the issue after pleading guilty to the lesser included offense. And his defense counsel specifically argued that the evidence was insufficient to prove penetration. We find that the stipulation was not equivalent to a confession to rape.

## VII. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

■ The appellant argues that his convictions for indecent exposure and indecent liberties with a child are factually and legally insufficient. He argues that because the conduct occurred in his own home, the exposure was not public. He also argues that there was no evidence indicating the exposure was not inadvertent. Finally, he argues the testimony of SW and JR is so inconsistent that it raises a reasonable doubt as to his guilt. We disagree.

Under Article 66(c), UCMJ, we approve only those findings of guilty we determine to be correct in law and fact. The test for legal sufficiency is whether, when the evidence is viewed in the light most favorable to the government, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having observed the witnesses, we are personally convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Reed*, 54 M.J. 37 (C.A.A.F.2000); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). After reviewing the evidence, including the videotaped interviews of the victims, we find that the evidence is legally and factually sufficient to support the appellant's convictions for indecent exposure to a child and taking indecent liberties with a child. The fact that the crimes occurred in the appellant's home does not require a contrary conclusion. *See United States v. Graham*, 56 M.J. 266 (C.A.A.F.2002) (indecent exposure need not occur in a public place).

## VIII. EXPERT VICTIM IMPACT TESTIMONY

The appellant maintains the military judge erred in admitting the testimony of an expert forensic psychologist concerning the possible long-term impact of the sexual offenses upon SW. We disagree.

In sentencing, the government called Dr. Ebert, who had extensive experience in diag-

nosing and treating victims of sexual abuse. Dr. Ebert testified that there are several typical psychological disorders that a sexual abuse victim is at risk of developing. He described those disorders and explained that one could not predict whether a victim will develop one or more of those disorders. Trial defense counsel objected to the testimony as speculative because the victim was not exhibiting any of the symptoms at the time. The military judge overruled the objection, noting that he could determine whether the testimony was relevant and applicable to this case.

Evidence is admissible in sentencing that shows "the specific harm caused by the defendant." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). R.C.M. 1001(b)(4) allows impact evidence that shows the crimes' effect on the victim, the victim's family, and the close community. *United States v. Wilson*, 35 M.J. 473 (C.M.A. 1992). We review the military judge's decision to admit Dr. Ebert's testimony for an abuse of discretion.

 We find no abuse of discretion. A qualified expert may provide testimony that child victims of sexual abuse are "at a higher risk" of suffering long-term effects of the abuse. *United States v. Stark*, 30 M.J. 328, 329–30 (C.M.A.1990). *See United States v. Hammond*, 17 M.J. 218 (C.M.A.1984) (expert testimony about the general effects of rape trauma admissible in sentencing). *See also United States v. Marchand*, 56 M.J. 630, 633 (C.G.Ct.Crim.App.2001) (testimony of increased risk to victims of sexual abuse admissible); *United States v. Hancock*, 38 M.J. 672 (A.F.C.M.R.1993) (battered wife syndrome evidence admissible). Dr. Ebert testified SW showed symptoms of psychological impact, and that she was receiving treatment for this impact. He testified that SW was more likely to have symptoms as she matured, and the appellant's crimes put her at greater risk for psychological disorders in the future. This was proper sentencing evidence and we find no error.

## IX. CONCLUSION

Specification 1 of Charge I is amended to read as follows:

In that SENIOR AIRMAN DARYL A. HAMMER, United States Air Force, 60th Supply Squadron, did, at or near Travis Air Force Base, California, between on or about 7 April 1998 and on or about 8 May 1998, knowingly possess a computer hard drive containing three or more images of child pornography.

Having modified the findings, we now must review the sentence. Where there has been an error causing a modification of the findings, we can reassess the sentence (instead of ordering a sentencing rehearing) if we can determine that the sentence would have been at least of a certain magnitude absent the error. *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F.2002) (citing *United States v. Sales*, 22 M.J. 305, 307 (C.M.A.1986)). In this case, that determination is relatively straightforward where the only change in findings is from guilty under clause 3 of Article 134, UCMJ, to guilty under clause 2 of that Article. In precisely this situation in *Sapp*, addressing the three clauses under Article 134, UCMJ, our superior court explained:

> The three clauses do not create separate offenses. Instead, they provide alternative ways of proving the criminal nature of charged misconduct.... The removal of any reference to a violation of a federal statute from the specification did not alter the essential nature of the offense.

*Sapp*, 53 M.J. at 92. With the same maximum punishment for the offenses, and the same essential nature of the offenses, we are confident that the military judge would have adjudged the same sentence if the offense had been prosecuted as a violation of clause 2 of Article 134, UCMJ. Furthermore, we find the adjudged and approved sentence appropriate.

The findings, as modified, and the sentence, as reassessed, are correct in law and fact and no other error prejudicial to the substantial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *Reed*, 54 M.J at 41. Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.